# In the United States Court of Federal Claims

No. 09-453V
(Filed Under Seal: September 9, 2015)
(Reissued for Publication: September 30, 2015)[1]

```
*************************************
J.H.,                            *
                                 *
              Petitioner,        *
                                 *        Vaccine Act; Motion for Review; Statute of
v.                               *        Limitations; Equitable Tolling; Mental
                                 *        Illness; Remand
SECRETARY OF HEALTH AND          *
HUMAN SERVICES,                  *
                                 *
              Respondent.        *
*************************************
```

Clifford J. Shoemaker, Vienna, VA, for petitioner.

Althea Walker Davis, United States Department of Justice, Washington, DC, for respondent.

## OPINION AND ORDER

**SWEENEY**, Judge

Petitioner J.H. filed a petition under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 to -34 (2012), alleging that he was injured as a result of his hepatitis A and hepatitis B vaccinations. The special master dismissed the petition, holding that petitioner's claim was barred by the statute of limitations and was not subject to equitable tolling. In his motion for review, petitioner concedes that his claim is time-barred, but contends that the special master erred in concluding that his mental illness did not warrant the application

---

[1] Vaccine Rule 18(b), contained in Appendix B of the Rules of the United States Court of Federal Claims, affords each party fourteen days in which to object to the disclosure of (1) trade secrets or commercial or financial information that is privileged or confidential or (2) medical information that would constitute "a clearly unwarranted invasion of privacy." Petitioner timely filed a motion to redact, and respondent filed a response. The court has reviewed the parties' positions, and has determined that petitioner's full name and the identities of certain family members–those included in the discussions of petitioner's family history of mental illness–should not be disclosed in this Opinion and Order. Petitioner's name is replaced with one or both of his initials, as appropriate, and the identities of his family members are replaced with bracketed ellipses ("[. . .]").

of equitable tolling.  For the reasons set forth below, the court grants petitioner's motion for review and remands the case to the special master for further proceedings.

## I.  BACKGROUND

### A.  Petitioner's Vaccinations and Subsequent Injuries

Petitioner was born in 1987.[2]  Around 2005, petitioner was bitten by a tick and developed progressive fatigue, headaches, obsessive-compulsive disorder ("OCD"), and cognitive disturbances.  On March 17, 2006, when he was eighteen years old, petitioner received a hepatitis A vaccination and his first hepatitis B vaccination.  That night, he experienced hot flashes, chills, and stabbing pains in his back, legs, and arms, all of which dissipated the following day.

Petitioner received his second hepatitis B vaccination on April 25, 2006.  On June 2, 2006, he was evaluated at the Valley Presbyterian Hospital emergency room for balance issues, dizziness, eye movement disturbances, fatigue, and pain.  His discharge diagnoses were dizziness and "arthralgias-myalgias [status post] hepatitis vaccination."  Six days later, at the request of petitioner's mother, one of petitioner's physicians agreed to order an MRI for petitioner.  However, petitioner did not obtain an MRI at that time.

In fact, petitioner did not obtain an MRI until February 14, 2009, after he went to the emergency room at Olive View-UCLA Medical Center ("Olive View") with complaints of chronic headaches and diffuse pain for the past year.  The MRI revealed white matter hyperintensities in petitioner's brain, leading a neurologist to suggest the possibility of a demyelinating disease.  Follow-up MRIs obtained on May 4, 2009, and August 11, 2009, strengthened the suspicion of a demyelinating disease.  Over the following three years, petitioner continued to receive treatment for his possible demyelinating disease and associated central nervous system symptoms.

### B.  Petitioner's Mental Illness

Petitioner's medical records reveal a family history of mental illness.[3]  For example, his [. . .] suffers from attention deficit disorder, Ex. 5 at 2, Ex. 11 at 3, and bipolar disorder, Ex. 11 at 3; Ex. 14 at 521.  His [. . .] is a hoarder, Ex. 7 at 37; Ex. 10 at 69; Ex. 14 at 442, and may suffer from depression, Ex. 10 at 69.  His [. . .] suffers or suffered from bipolar disorder, id. at 2, 69;

---

[2]  The court derives the facts in this section, which pertain to petitioner's vaccinations and subsequent neurological injuries, from the special master's March 23, 2015 decision dismissing the case for lack of jurisdiction.  See generally J.H. v. Sec'y of HHS, No. 09-453V, 2015 WL 1779274 (Fed. Cl. Spec. Mstr. Mar. 23, 2015).

[3]  The court derives the facts in this section, which pertains to petitioner's mental illness, from the medical records and affidavits submitted by petitioner in support of his claims.

Ex. 14 at 442, 521, schizoaffective disorder, Ex. 10 at 69, and/or anxiety and mood swings, Ex. 7 at 37.  His [. . .] suffered from bipolar disorder.  Ex. 10 at 2.  His [. . .] is or was a hoarder.  Id. at 69.  And, his [. . .] may have had Wilson disease.[4]  Ex. 14 at 521.

The first reference in petitioner's medical records to his mental health issues appears in a September 28, 2004 notation by an individual in his pediatrician's office describing his mother's report that a psychiatrist had given him a prescription for Adderall.  Ex. 3 at 4.  Then, sometime before March 21, 2005, petitioner developed OCD and was prescribed Zoloft to treat it.  See id. (indicating that petitioner was taking Zoloft as of March 21, 2005); Ex. 5 at 3-4 (noting that Zoloft was used to treat petitioner's OCD).  He was seventeen years old at the time of his OCD diagnosis.  Ex. 5 at 2; Ex. 7 at 45-46.

Although petitioner's OCD diagnosis is mentioned in these earlier medical records, it is not until July 2007 that his medical records indicate the full extent of his condition.  On July 10, 2007, petitioner was assessed at the West Valley Mental Health Center.  The record of that visit includes the following history:

> OCD:  2 yr hx of taping [sic], touching, counting.  Stress [with] environment made it worse.  Hx of depression.  Took Zoloft (4 wks) made him worse.  Prozac made him feel surreal.  Racing thoughts [with] counting.  No current SI.  Not sleeping.  Argumentative at times.  No good sleeping.  Naps during day.  Sometimes sleeps too much.  Very pale. + psychosis, seeing shadows.  "It's bad air, environmental."

Ex. 11 at 3; see also id. (noting that petitioner had been treated by a private psychiatrist, Dr. John Nassi).  A mental status evaluation revealed impaired intellectual functioning, impaired memory, and impaired concentration.  Id. at 7.  The evaluator, a licensed medical health professional, identified two diagnoses:  nonspecified psychosis and OCD.  Id. at 8.  A physician agreed with the diagnosis of nonspecified psychosis and noted that "OCD [versus] bipolar disorder" should be ruled out.  Id. at 14.

On September 9, 2007, petitioner went to the emergency room at West Hills Hospital and Medical Center ("West Hills") with chest pains, heart palpitations, and OCD symptoms.  Ex. 8 at 76; accord id. at 61 (noting a history of "severe OCD").  The emergency room physician noted that petitioner appeared incapable of providing his medical history:  "The patient is [an] extremely vague historian.  The mother almost controls his situation and provides the history.  The patient really is less than forthcoming as far as descriptions and appears to be unable to make

---

[4]  Wilson disease is "a rare, progressive, autosomal recessive disease due to a defect in metabolism of copper.  Accumulation of copper in the liver, brain, cornea, and other tissues results in liver poisoning, with cirrhosis in the liver and degenerative changes in the brain, particularly the basal ganglia."  Dorland's Illustrated Medical Dictionary 545 (32d ed. 2012).

a cogent history as far as quality of his discomfort, or length of time." Id. at 76.  With respect to petitioner's mental health, the physician wrote:

> The mother says the patient has had a long-standing history of OCD and that his brain is moving so quickly that he is almost paralyzed as far as being able to respond.  He has had psychiatric intervention in the past.  He was recently started on dextrostat for possible [attention deficit hyperactivity disorder].
>
> . . . .
>
> On review the patient currently has been on several other psychotropic medications that . . . did not lead to any real improvement.
>
> The mother also relates that the child has had a significant change in his personality over the last 18 months.  . . .
>
> . . . .
>
> . . .  This is a 20-year-old gentleman who is having atypical chest pain.  He has had this discomfort intermittently for 6 months.  . . .  I do believe that the patient may have an underlying psychological cause for this discomfort.  He clearly has significant impairment due to his OCD.

Id. at 76-77; cf. id. at 72-75 (reflecting that petitioner's mother signed the discharge instructions).
But cf. id. at 54-56 (reflecting that petitioner signed the admission paperwork).

Beginning in November 2007, and for the following seven months, petitioner was treated at the San Fernando Valley Community Mental Health Center's Transitional Youth Outpatient Program ("TYOP").  See generally Ex. 10.  Petitioner's initial assessment occurred on November 16, 2007.  Id. at 2-7.  The following medical history was provided:

> At age 17, client began to exhibit symptoms consistent with OCD, which included debilitating panic attacks.  Client reports that he "counts everything," to include words spoken, letters in words, scenes from TV.  It is reported that anything "associated with a bad number, is contaminated."  Client will not touch anything metal due to "contamination," and will not speak about his medications, past or present, as this contaminates them.  Client engages in repetitive actions, which include his walking back and forth without purpose, and touching things numerous times, or tapping out rhythms in number sequences.  Client further chants things in order, and engages in ritualized behaviors around mundane acts, such as brushing teeth, and getting into bed.  Client reports intrusive thoughts, which take the form of violent thoughts and images, of "weapons in the air," violence happening to self or family, and "enemies" in his head." [sic]  It is

reported that client is "scared of everything."  Client experiences racing thoughts, and paranoia, which is described as his being controlled.

Id. at 2; see also id. at 59 (noting that petitioner's symptoms "began about three yeas ago, and have become increasing[ly] worse over time").  In addition, the following psychiatric history was provided:

> Client has had no psychiatric hospitalizations, but it is reported that he has been taken to the emergency room of numerous hospitals, in an attempt to try and get him help for his severe symptoms.  Client has been seen by private psychiatrists for medications, and also has been seen by private therapists.
>
>  . . . .
>
> It is reported that there has been some improvement in client condition since beginning to take anti-psychotic medications, even though his symptoms persist.  Client's mother states that he has been much worse in the past.

Id. at 2; accord id. at 59. At the time of this evaluation, petitioner was taking Risperdal, lithium, and Ativan.  Id. at 3.  A mental status evaluation revealed no impairments to petitioner's intellectual functioning and memory, but did reveal issues with concentration.  Id. at 6.  The evaluator, a therapist, identified a primary diagnosis of OCD, and futher indicated that paranoid schizophrenia and a nonspecified psychotic disorder should be ruled out.  Id. at 7, 59.

After this initial assessment, petitioner was treated at TYOP by a psychiatrist, Dr. N. Jones, and a therapist, Jennifer West.  In her initial evaluation of petitioner on December 7, 2007, Dr. Jones noted the following history:

> When asked what medications he has been on in past pt had to get up and leave room.  Mother explained that pt feels that if we say the name of his medication, he thinks the medication will become contaminated.  Pt has numerous counting rituals involving letters and words, and "if certain letters are in a word, he can't say them".  Dx w OCD 3 yrs ago & this has worsened in the last yr.  Pt states he has "very bad panic. Dozens of stuff. Depression. They're really bad."  States that panic sxs "are really disruptive.  It takes up a lot of time.  If you want to do an activity, it would disrupt that."  States that he feels SOB, "sweats, heart palpitations, my mind kind of races".  Admits to impending sense of doom, nausea, dizziness.  Sxs last for about 20 min.  States that there are triggers, but he cannot recall what those are.  Gets 5-25 panic attacks per day.  Re: paranoia: "That goes along with the panic.  You just get really worried about a lot of stuff, like OCD stuff.  Images, numbers you gotta count, tapping on objects and walls and tables and chairs, you chant words, stuff really needs to be organized, there's a lot symmetrical stuff.  You can see weapons, bad people doing bad stuff, and

events that are bad." States that he believes that images might become true b/c "It seems so real." When asked about his prolonged latency when answering questions, he admitted to "doing rituals in my head". "There are voices in my head . . . a couple years. They say bad things." Admit[s] that they tell him to do bad things, "basically you just don't listen." Admits to feeling that "common, random people" are out to "physically harm" him.

Id. at 70. With respect to petitioner's medications, Dr. Jones noted: "In past has been on Zoloft, but developed agitation, racing thoughts & mood [lability]. Also on prozac w similar probs. Had been up to 3 mg a day of risperidone which helped for psychosis but mother felt it caused inc in OCD sxs & sedation." Id. Dr. Jones provided an assessment of OCD and nonspecified psychotic disorder, and further indicated that schizoaffective disorder and bipolar disorder should be ruled out. Id. at 69.

Ms. West began seeing petitioner four days after his initial assessment. Id. at 58. Shortly thereafter, on November 26, 2007, Ms. West indicated that petitioner was experiencing panic attacks five times per week and symptoms of psychosis–including paranoia and feelings of being controlled–daily. Id. at 55. The notes from Ms. West's sessions with petitioner are replete with comments indicating that petitioner was unable to verbalize his thoughts and that petitioner continued to experience "prominent," "severe," and "debilitating" symptoms of anxiety, OCD, and psychosis, including panic attacks, hallucinations, paranoia, delusions, racing thoughts, ritualized behaviors, obsessive counting, repetitive actions, believing that things are contaminated, and depression. See generally id. at 9-57; see also id. at 22 (indicating that on February 15, 2008, petitioner "continued to struggle in producing answers about any activities in the recent past" and admitted "that his memory was poor"), 26 (indicating that on January 28, 2008, petitioner stated that it was "difficult for him to go out, as there [were] many 'triggers' to his anxiety"), 30 (indicating that on January 18, 2008, petitioner described his "recent problems as having a 'sandstorm' in his mind, adding that it creates problems with focus, memory, and thinking clearly"), 33 (indicating that on January 7, 2008, petitioner admitted not having "much of a sense of what time it is"). Indeed, by June 9, 2008, Ms. West reported that petitioner experienced symptoms of depression five times per week, hallucinations from twenty to thirty times per day, responses to compulsions from ten times per hour to ten times per day, and panic attacks seven times per day. Id. at 12.

While attending therapy, petitioner continued to be seen by Dr. Jones. See generally id. at 60-68. Of particular note, Dr. Jones learned during a January 25, 2008 appointment that petitioner's mother was adjusting petitioner's medications in response to his varying reactions. See id. at 65 ("Pt is a 20 yo male w severe OCD and psychotic d/o [not otherwise specified] who cont to have depressive, psychotic and obsessive-compulsive sxs in context of mother self-adjusting doses & starting/stopping meds on own."). In addition, during a February 1, 2008 appointment, Dr. Jones discussed with petitioner and his mother a voluntary admission at UCLA for an inpatient treatment program. Id. at 64. Dr. Jones made the appropriate arrangements with UCLA. Id. at 62, 64. However, on February 15, 2008, an official at UCLA advised Dr. Jones

-6-

that petitioner and his mother declined admission.  Id. at 61.  Although Dr. Jones and Ms. West discussed the importance of the admission with petitioner and his mother later that day, id. at 21-22, 61, petitioner was never admitted to UCLA as an inpatient, id. at 17-19, 60.  Petitioner's last appointment at TYOP was on June 23, 2008.  Id. at 9.  Because the staff at TYOP was unable to reach petitioner or his mother for several months, TYOP discharged petitioner from its care on September 16, 2008.  Id. at 8.

In the meantime, on March 3, 2008, petitioner visited the emergency room at West Hills to be evaluated for near syncope and vomiting.  See generally Ex. 8 at 27-52.  His mother provided the relevant information to the emergency room staff, including that petitioner had been diagnosed with OCD.  Id. at 32; see also id. at 28-31 (reflecting that petitioner's mother signed the admission paperwork), 44-46 (reflecting that petitioner's mother signed the discharge instructions).  Then, on December 4, 2008, petitioner was evaluated at the West Hills emergency room for a rash on his left thigh and redness of his right eye.  See generally id. at 2-26.  Both he and his mother provided the relevant information to the emergency room staff, including that petitioner had psychiatric issues.  Id. at 7; accord id. at 25 (noting a past medical history of bipolar disorder); see also id. at 3-6 (reflecting that petitioner initialed, and his mother signed, the admission paperwork), 17-20 (reflecting that petitioner's mother signed the discharge instructions).

As noted above, two months later, petitioner was seen at the Olive View emergency room with complaints of chronic headaches and diffuse pain for the past year.  See generally Ex. 7 at 5-8.  Petitioner provided his medical history to the emergency room staff during this February 13, 2009 visit.  Id. at 8.  After he was discharged from the emergency room, petitioner was seen at Olive View on a regular basis as an outpatient at a number of clinics, including the neurology, infectious disease, and infectious disease-psychiatry clinics.  See generally Ex. 7 (containing records dated February 2009 through July 2010), Ex. 12 (containing records dated May 2009 through December 2011), Ex. 14 (containing records dated February 2009 to October 2012).

Petitioner had his initial evaluation with Dr. Robert J. Dasher, an Olive View psychiatrist, on October 22, 2009.  Ex. 14 at 440.  Petitioner reported, among other things, being foggy in his head and having memory issues over the last four to five years, and specifically noted that he could not remember some things that he used to remember.  Id. at 441.  A mental status examination revealed petitioner's long-term memory to be impaired.  Id. at 446.  Dr. Dasher's principal diagnosis was a nonspecified cognitive disorder, and he indicated that OCD and bipolar disorder should be ruled out.[5]  Id. at 447.

---

[5]  Dr. Dasher's later diagnoses and assessments included:  "mood instability" on January 7, 2010, Ex. 14 at 437; "OCD/bipolar" on August 5, 2010, id. at 426; "psychological and behavioral dysfunction" on September 30, 2010, id. at 422; "organic mania" on October 15, 2010, id. at 405; "organic mood/psychotic disorder" on January 27, 2011, id. at 399; "mania/psychosis" on March 8, 2011, id. at 395; "[v]ery difficult mood, psychotic and anxiety [symptoms]" on September 2, 2011, id. at 54; "an unusual psychiatric presentation with elements

As part of his initial treatment plan, Dr. Dasher ordered neurocognitive/psychological testing for petitioner.  Id. at 440, 447.  Petitioner underwent this testing sometime in late 2009. Id. at 29-31.  Although the medical records submitted by petitioner do not contain the contemporaneous test results, the results are addressed in a February 2011 medical record discussing the results of retesting.  Id.; see also id. at 401-02, 420 (noting that the retesting occurred in January 2011).  The February 2011 record revealed the following information regarding the 2009 testing:

> The patient[']s scores from psych/neuropsych testing in 2009 were compared to his scores from retesting in 2011 in order to evaluate areas of improvement and decline in cognitive functioning.
>
> . . . .
>
> In the language domain, a large discrepancy in the negative direction was seen in expressive vocabulary (word knowledge) with an average score in 2009 (50th %ile) but an impaired score in 2011 (<1st %ile).  His object naming scores remained stable across time as both were impaired (<1st %ile).  This stability was also seen in his scores on receptive vocabulary (hearing a word and choosing a picture that best matches it) which were average (27th %ile and 25th %ile, respectively).  In phonemic fluency (generating a list of words that begin with a particular letter), a noticeable discrepancy in the positive direction across time was found between his impaired (1st %ile) score in 2009 and his low average (21st %ile) score in 2011.  A similar pattern was found in his score on semantic fluency (generating a list of words belonging to a particular semantic category: animals) which was borderline (4th %ile) in 2009 and average (42nd %ile) in 2011.
>
> In the visual-spatial domain, the patient[']s score in copying a complex figure was in the impaired range (<1st %ile) in both 2009 and 2011.  His score in visual acuity/line closure decreased, though not significantly, from the average range in 2009 (42nd %ile) to the low average range in 2011 (23rd %ile). However, his score in 3D visuoconstruction improved somewhat, though not significantly, from a 2009 performance (9th %ile, low average) to 2011 (37th %ile, average).
>
> While almost all of the patient[']s scores in the verbal memory domain were impaired in both assessments, the exception was his free recall score on a

---

of both mania and psychosis" on October 7, 2011, Ex. 12 at 19; and "organic mood disorder" and "bouts of depression" on July 11, 2012, Ex. 14 at 105.  In addition, Dr. Dasher noted on January 7, 2010, January 28, 2010, and July 11, 2012, that he could not rule out bipolar disorder.  Id. at 105, 434.  He further noted on July 11, 2012, that schizophrenia was unlikely.  Id. at 105.

word list after being administered an interference list, where he showed significant improvement over time (<1st %ile/impaired in 2009; 25th %ile/average in 2011).

A mixed pattern was found in the visual memory domain.  Most of the patient's scores were in the impaired range in both 2009 and 2011.  However, his recognition of simple geometric figures was average in 2009 (37th %ile), but low average/within normal limits in 2011 (16th %ile) while his recognition of a complex figure in 2009 was impaired (<1st %ile), but low average in 2011 (14th %ile).

In the executive functions domain, the patient had impaired scores at both times on behavioral inhibition, mental flexibility, complex problem solving, working memory, sustained attention/concentration, and learning from feedback. However, notable improvements were seen in both phonemic/letter and semantic/animals verbal fluency; his 2009 letters score was impaired (1st %ile), but improved to the low average range (21st %ile) in 2011.  His semantic fluency score was borderline (4th %ile) in 2009, but average (42nd %ile) in 2011.

Id. at 29-30.  Overall, Dr. Dasher's records reflect most of the same symptoms and the same severity of those symptoms that were reported in TYOP's records.  See, e.g., id. at 29-31, 54, 83, 90-93, 95-97, 100, 102-07, 395, 399, 401-10, 412-20, 422, 425-26, 431, 434, 437, 441-47, 489-92, 506, 526-29; Ex. 7 at 14, 17, 20, 37; Ex. 12 at 3-4, 12-13, 17-20, 26, 33-34.  Indeed, Dr. Dasher reported on December 9, 2011, that petitioner was "starting to stabilize from [a] very difficult several year course" of behavioral issues and psychosis.  Ex. 12 at 4.

In addition to the above diagnoses and assessments, the medical records reflect that petitioner experienced issues in other aspects of his life.  For example, petitioner dropped out of school in eleventh grade due to his debilitating symptoms.  See, e.g., Ex. 10 at 5 ("Client has completed the 10th grade, having stopped attending school due to the onset of symptoms, and anxiety so debilitating, he was unable to do the work necessary to stay in school."); Ex. 14 at 443 (indicating that petitioner reported dropping out of school in eleventh grade due to confusion and an inability to think clearly).  In addition, petitioner had no work history as of July 10, 2007, Ex. 11 at 6, and was unable to work as of October 22, 2009, Ex. 14 at 447; accord Ex. 12 at 18 (indicating that petitioner remained unable to work as of October 7, 2011).  Moreover, Ms. West advised petitioner on November 28, 2007, that given his symptoms, it was not appropriate for him to become involved in activities with people his age.  Ex. 10 at 52.

An affidavit executed by petitioner's mother on September 29, 2014, is consistent with the information contained in petitioner's medical records.  See Ex. 19.  She reported that within one year of the tick bite, petitioner began exhibiting OCD symptoms and complaining of "spaciness and fogginess in his brain."  Id. at 1.  Nevertheless, she explained, petitioner remained

active and social.  Id.  However, once petitioner received his hepatitis B vaccination in March
2006, his condition changed.  Id.  Petitioner's mother reported:

> After the March 2006 shot . . . it was night and day.  It was like he got hit
> by a bus.  He got very very ill within the month after the shot.  He deteriorated
> rapidly. . . .  He had severe pain shooting up and down his spine.  He was
> screaming in pain.  His eyes were jittery and moving all over the place.  This
> didn't stop for the next year.  He had to drop out of school–his independent study
> program.

> After the shot, he couldn't do anything.  Couldn't do any of the things he
> loved.  My son was wiped clean.  Like his brain was scrambled.

> Within 6 months he declined rapidly.  He didn't know who he was.  He
> forgot his past. . . .  He was completely dependent on me.  He couldn't cook.  I
> picked out his clothes.  He could dress himself but could not bathe himself. . . .[6]

> During that time J. never went to a doctor's appointment by himself.  He
> couldn't drive himself.  He still can't drive.  At those first doctor's appointments
> right after the shot he was terrified and scared.  He would tell them his symptoms
> but then as it progressed he stopped talking to the doctors.  I communicated for
> him.  It was too difficult for him.  He couldn't ask questions.  He couldn't process
> what doctors told him, or what anyone told him.  He couldn't follow them.
> Eventually, in the last couple of years he has been able to talk to his psychiatrist
> but he still insists I'm right there with him in appointments.

> He still has trouble following what people are saying and instructions.  I
> administered all of his medications.  I still do.  The side effects of his medications
> make it hard for him to interact as well.  I do all of his daily living things like
> cooking and laundry and driving.  It's difficult to get him in the shower.  He will
> try to bathe himself but he doesn't do a good job.

> I would describe him during those years of 2006 after the shot to 2009 as
> being completely mentally disabled.  Completely incapacitated.  It was like he
> reverted to childhood functionality.  He couldn't make decisions.  Even simple
> decisions.  If you asked him what he wanted to eat he would sit and stare.  He
> couldn't engage in any meaningful way.  He was completely dependent on me.
> He is still completely dependent on me.

Id. at 1-2 (footnote added); see also Ex. 7 at 46 (noting, in the record of an August 4, 2009
neurological evaluation, the following: "Pt was normal prior to age of 17, abrupt onset OCD-like

---

[6]  The first line of the second page of the affidavit is cut off and illegible.

-10-

behavior (counting, checking, etc) over 1 month, then onset of a mental 'fogginess'/'detached from reality' of [sic] insidious onset that has since waxed and waned with periods of 'normalcy.' By the age 19, mother states he has never been back to baseline psych level.").

## C. Procedural History

Petitioner filed his Vaccine Act petition on July 15, 2009, alleging injuries resulting from his hepatitis A and hepatitis B vaccinations.[7]  Although petitioner acknowledged that there might be a statute of limitations issue, he pursued his claim over the next four-and-one-half years by filing medical records.  On April 30, 2012, after petitioner filed most of the relevant medical records, respondent filed her report pursuant to Vaccine Rule 4, which included a motion to dismiss the petition.  In her motion to dismiss, respondent argued that the petition was untimely under the Vaccine Act because petitioner experienced symptoms of his injuries more than thirty-six months before filing the petition.

On August 23, 2013, petitioner submitted an expert report from Dr. Carlo Tornatore.  Dr. Tornatore opined that based on the medical records, a diagnosis of neuroborreliosis–a late manifestation of Lyme disease–"would not be unreasonable," that the "neuroborreliosis began in 2005," and that petitioner's June 2, 2006 symptoms reflected a worsening of his "underlying autoimmune demyelinating disorder."  Five months later, petitioner filed a memorandum in response to the motion to dismiss in which he argued that the statute of limitations should be equitably tolled because despite his and his mother's diligent efforts, extraordinary circumstances prevented him from filing a Vaccine Act petition within the thirty-six month limitations period. Respondent submitted a response to petitioner's memorandum on May 9, 2014, and petitioner filed a reply on October 1, 2014.

In a March 23, 2015 decision, the special master concluded that the petition was not timely filed and that petitioner had not established that the statute of limitations should be equitably tolled.  He therefore granted respondent's motion to dismiss.  Petitioner timely filed a motion for review, and respondent submitted her response.  The court heard argument on September 3, 2015, and is prepared to rule.

## II.  DISCUSSION

The United States Court of Federal Claims possesses jurisdiction to review the record of the proceedings before a special master, and upon such review, may:

(A)  uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

---

[7]  The court derives the procedural history in this section from the special master's March 23, 2015 decision, J.H., 2015 WL 1779274, and the parties' filings.

(B)  set aside any findings of fact or conclusion of law of the special master found
to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
with law and issue its own findings of fact and conclusions of law, or

(C)  remand the petition to the special master for further action in accordance with
the court's direction.

42 U.S.C. § 300aa-12(e)(2); accord Vaccine Rule 27(c).  In the instant case, petitioner contends
that the special master both abused his discretion by substantially mischaracterizing his condition
and acted contrary to law in applying the doctrine of equitable tolling to his circumstances.  An
abuse of discretion occurs when a "decision is based on clearly erroneous findings of fact, is
based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful."
Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc); accord
Hendler v. United States, 952 F.2d 1364, 1380 (Fed. Cir. 1991) ("An abuse of discretion may be
found when (1) the court's decision is clearly unreasonable, arbitrary, or fanciful; (2) the decision
is based on an erroneous conclusion of the law; (3) the court's findings are clearly erroneous; or
(4) the record contains no evidence upon which the court rationally could have based its
decision."), quoted in Murphy v. Sec'y of HHS, 30 Fed. Cl. 60, 61 (1993).  It is well settled that
under this standard, the court accords deference to the special master's factual findings and fact-
based conclusions.  See, e.g., Whitecotton v. Sec'y of HHS, 81 F.3d 1099, 1108 (Fed. Cir. 1996)
("Congress desired the special masters to have very wide discretion with respect to the evidence
they would consider and the weight to be assigned that evidence."); Munn v. Sec'y of HHS, 970
F.2d 863, 871 (Fed. Cir. 1992) (emphasizing that "the probative value of the evidence" was
within the special master's purview as fact finder).  It is not the court's role to reweigh the
evidence.  See Hodges v. Sec'y of HHS, 9 F.3d 958, 961 (Fed. Cir. 1993) ("[O]n review, the
Court of Federal Claims is not to second guess the Special Master[']s fact-intensive conclusions;
the standard of review is uniquely deferential for what is essentially a judicial process.").  In
contrast, under the "not in accordance with law" standard, the court reviews the special master's
legal conclusions de novo.  Saunders v. Sec'y of HHS, 25 F.3d 1031, 1033 (Fed. Cir. 1994).

## A.  The Vaccine Act's Statute of Limitations and Equitable Tolling

Petitioner's motion for review implicates the Vaccine Act's statute of limitations.  Under
the Vaccine Act, a petition for compensation for a vaccine-related injury must be filed within "36
months after the date of the occurrence of the first symptom or manifestation of onset or of the
significant aggravation of such injury."  42 U.S.C. § 300aa-16(a)(2).  The special master
concluded that petitioner's complaint was not timely filed because his claim–the significant
aggravation of his neuroborreliosis–accrued no later than June 2, 2006, when he visited the
Valley Presbyterian Hospital emergency room with dizziness and eye movement disturbances.
Petitioner does not contest that conclusion.  Rather, petitioner argues that the statute of
limitations should be equitably tolled due to his mental illness.

-12-

The Vaccine Act's statute of limitations can be equitably tolled.  Cloer v. Sec'y of HHS, 654 F.3d 1322, 1344 (Fed. Cir. 2011) (en banc).  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005), cited in Cloer, 654 F.3d at 1344.  The application of equitable tolling should be considered on a case-by-case basis, and a rigid invocation of mechanistic rules should be avoided.  Holland v. Florida, 560 U.S. 631, 649-50 (2010); accord Arctic Slope Native Ass'n v. Sebelius, 699 F.3d 1289, 1295 (Fed. Cir. 2012).  Overall, however, federal courts apply the equitable tolling doctrine "sparingly."  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990), cited in Cloer, 654 F.3d at 1344.

Although the United States Supreme Court has not addressed whether a statute of limitations can be equitably tolled due to mental illness, a number of federal appellate courts have concluded, in cases not involving the Vaccine Act, that equitable tolling is available in such circumstances.  See Barrett v. Principi, 363 F.3d 1316, 1318-20 (Fed. Cir. 2004).  For example, in Barrett v. Principi, the United States Court of Appeals for the Federal Circuit concluded that the 120-day period for appealing a decision of the Board of Veterans' Appeals can be equitably tolled due to mental illness.  Id. at 1317-21.  It held:

> [T]o obtain the benefit of equitable tolling, a veteran must show that the failure to file was the direct result of a mental illness that rendered him incapable of "rational thought or deliberate decision making," or "incapable of handling [his] own affairs or unable to function [in] society."  A medical diagnosis alone or vague assertions of mental problems will not suffice.

Id. at 1321 (citations omitted).  The special master applied the standard set forth in Barrett in analyzing petitioner's equitable tolling argument.[8]  J.H., 2015 WL 1779274, at *6.

## B.  The Special Master's Characterization of Petitioner's Condition Does Not Comport With the Medical Records

Petitioner argues that the special master substantially mischaracterized his mental health condition in his decision, asserting that his medical records reflect a much more serious and complex condition than the OCD diagnosis noted by the special master.  As explained below, petitioner is correct.

---

[8]  Although respondent emphasizes the fact that Barrett does not concern the Vaccine Act, neither she nor petitioner seeks review of the special master's application of the standard set forth in Barrett to petitioner's circumstances.  And, as explained below, this case is being remanded to the special master for a full evaluation of the medical evidence presented by petitioner.  Accordingly, the issue of whether the Barrett standard should be applied in Vaccine Act cases is not before the court.

**1. The Special Master's Recitation of the Facts Relating to Petitioner's Mental Illness**

The special master included the following information regarding petitioner's mental health condition in his recitation of facts:

> At the time of his birth, Mr. H.'s [. . .] had attention deficit disorder (ADD), and a [. . .] possibly had obsessive-compulsive disorder (OCD).  Exhibit 5 at 4.  His [. . .] and [. . .] were both diagnosed with bipolar disorder.  Exhibit 10 at 2.
>
> While on a camping trip to Big Sur, California in approximately 2005, Mr. H. was bitten by a tick.  Afterwards, he developed progressive fatigue, headaches, OCD, and cognitive disturbances.  Exhibit 7 at 22; see also exhibit 5 at 2 (indicating that Mr. H.'s OCD commenced at the age of seventeen).
>
> . . . .
>
> On June 8, 2006, Mr. H.'s mother called Noble Community to complain about a neurologist who was unfamiliar with using Zoloft to treat OCD.  Exhibit 5 at 4.  . . .
>
> . . . .
>
> On September 9, 2007, Mr. H. was evaluated for chest pain, OCD problems, and palpitations at West Hills Hospital and Medical Center.  Exhibit 8 at 76.  The physician's notes stated "the mother almost controls the situation and provides the history," because Mr. H. "appears to be unable to make a cogent history" of his condition and symptoms.  Id.  Mr. H.'s mother averred that Mr. H. had a long history of OCD and had been taking several psychotropic medications without benefit.  Mr. H. was reported to have suffered from palpitations since starting to take Dextrostat for possible ADHD.  Id.  At this visit, Mr. H.'s mother maintained that Mr. H. had had a significant change in his personality for the past 18 months, which she attributed to the "hepatitis vaccinations."  Id. at 76-77.  The evaluating physician stated that Mr. H. has an underlying psychological cause for his discomfort and that he has significant impairment due to his OCD.  Id.
>
> In November 2007, physicians at the San Fernando Valley Community Mental Health Center Transitional Youth Outpatient Program assessed Mr. H. During the evaluation, Mr. H.'s OCD symptoms were described in detail.  Exhibit 10 at 2-3.  Mr. H.'s medications included Lithium, Risperdal, and Ativan to control his symptoms with his response being characterized as fair.  Mr. H. was scheduled to be seen two to three times a week to manage and to reduce his symptoms.  Cognitive behavioral therapeutic interventions were designed to be used as part of the treatment.  Id. at 59. Between November 2007 and January

2008, Mr. H. intermittently attended therapy and then stopped attending therapy at the clinic. Id. at 24, 26, 66. After he discontinued attending therapy on February 4, 2008, Mr. H. did not respond to attempts by the clinic to reach him. Id. at 8, 24. As a result, Mr. H. was discharged from the therapy at the clinic on September 16, 2008. Id. at 8.

. . . .

On August 4, 2009, Mr. H. was evaluated by Dr. Mishra, a neurologist at Olive View, for headaches, intermittent arm numbness, arm and back spasms, OCD problems, and bipolar disorder. Exhibit 7 at 45-46. . . .

To further test for Lyme disease, Mr. H. was seen by an infectious disease specialist, Dr. Dasher,[9] on October 22, 2009. Exhibit 7 at 23-25.[10] Dr. Dasher stated that Mr. H. had a non-specific cognitive disorder and referred Mr. H. for neurocognitive and psychological testing. Id.

Id. at *1-3 (footnotes added).

Comparing this recitation of facts with the contents of the medical records–described earlier in this Opinion and Order, see supra Part I.B–reveals that the special master failed to discuss a number of relevant medical records and gave short shrift to many of the medical records he did address. Specifically, the special master did not mention: (1) petitioner's July 10, 2007 visit to West Valley Mental Health Center, (2) the repeated diagnosis of a nonspecified psychosis, (3) petitioner's treaters' notations that a diagnosis of schizophrenia or schizoaffective disorder needed to be ruled out, (4) Dr. Dasher's repeated notations that he was unable to rule out a diagnosis of bipolar disorder, a diagnosis that had also been raised by Dr. Jones, (5) the severity of petitioner's symptoms, (6) the results of petitioner's 2009 neurocognitive/psychological testing,[11] (7) petitioner's educational and work history, and (8) any evidence of petitioner's

---

[9] The medical records reflect that Dr. Dasher is a psychiatrist who works in Olive View's infectious disease-psychiatry clinic. See, e.g., Ex. 7 at 67 (noting that petitioner was being "followed by psychiatry, Dr. Dasher"); Ex. 12 passim (containing records indicating that Dr. Dasher saw petitioner at the infectious disease-psychiatry clinic); Ex. 14 at 447 (containing Dr. Dasher's name and signature above the line titled "Psychiatrist's Name and Signature").

[10] Only one of these pages is a record created by Dr. Dasher. Ex. 7 at 23. The other two pages are records created by other physicians in August 2009 and January 2010. Id. at 24-25. The complete set of records from Dr. Dasher's initial evaluation of petitioner on October 22, 2009, can be found in Exhibit 14 at pages 440 to 447.

[11] The court recognizes that this testing occurred sometime between October 22, 2009, and December 31, 2009, after the filing of the petition. Nevertheless, the testing occurred no

ability or inability to function independently.  And, the special master only briefly referred to petitioner's extensive mental health records from TYOP and Olive View, which include the detailed records of Ms. West's therapy sessions with petitioner and the comprehensive psychiatric treatment records from Dr. Jones and Dr. Dasher.[12]

Generally, the court presumes that a special master has reviewed all of the material in the record, regardless of whether it is mentioned in his or her decision.  Hazlehurst v. Sec'y of HHS, 604 F.3d 1343, 1352 (Fed. Cir. 2010).  Moreover, special masters are not required to discuss every piece of evidence or testimony in their decisions.  See Maza v. Sec'y of HHS, 67 Fed. Cl. 36, 38 (2005) ("The Special Master need not discuss every item of evidence in the record so long as her decision makes clear that she considered the petitioners' arguments."); Snyder v. Sec'y of HHS, 36 Fed. Cl. 461, 466 (1996) ("The special master need not discuss every item of evidence in the record so long as the decision makes clear that the special master fully considered a party's position and arguments on point."), aff'd, 117 F.3d 545 (Fed. Cir. 1997); Murphy v. Sec'y of HHS, 23 Cl. Ct. 726, 734 n.8 (1991) ("The special master is not required to discuss every item of evidence when his decision reflects that he fully considered a party's position and arguments on point."), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992) (mem.).  In this case, however, there is a substantial amount of relevant evidence that was not discussed by the special master.  The special master's failure to address this evidence indicates that he did not fully consider petitioner's position and arguments regarding his mental illness.

### 2.  The Special Master's Analysis Premised on His Recitation of Facts

Moreover, not only did the special master fail to consider all of the relevant evidence in his decision, but he unduly minimized the evidence that he did consider.  Here is the special master's analysis of petitioner's equitable tolling argument, in its entirety:

> Mr. H.'s argument that his history of mental illness constitutes an extraordinary circumstance for the purposes of equitable tolling is unsubstantiated.  As recounted above, Mr. H. has been diagnosed with and treated for OCD.  He has also been referred for cognitive testing.  But, as held in Barrett, "a medical diagnosis alone . . . will not suffice." 363 F.3d at 1321.  Mr. H. must also establish that the "mental illness rendered him incapable of 'rational thought or deliberate decision making,' or 'incapable of handing [his] own affairs or unable to function [in] society.'" Barrett, 363 F.3d at 1321 (citations omitted).

---

more than five-and-one-half months after the petition was filed, and therefore may provide some insight into petitioner's condition at that time.

[12]  Although Dr. Dasher did not begin treating petitioner until after the petition was filed, his records contain information concerning petitioner's mental health history, and are largely consistent with the mental health records from before the petition was filed.

Mr. H. was given an opportunity to substantiate his claim that his inability to meet the limitations period was a direct result of his mental illness but failed to do so.

Mr. H. acknowledges that when he received the vaccine, he was legally an adult and deemed by his mother to be competent.  Pet'r's Memo. at 8, 10. Furthermore, Mr. H. has not presented any evidence showing that he was the ward of a guardian.  Id.

Mr. H. has not satisfied his burden of demonstrating that the Vaccine Act's statute of limitations should be equitably tolled.  Thus, Mr. H. did not establish that his mental illness was an extraordinary circumstance that rendered him incapable of rational thought or deliberate decision-making.  See Barrett, 373 F.3d at 1321.  Nor did Mr. H. establish that his mental illness left him incapable of handling his own affairs or unable to function in society.  Id.

J.H., 2015 WL 1779274, at *6 (footnote omitted).  By condensing petitioner's mental health condition into two short sentences ("Mr. H. has been diagnosed with and treated for OCD.  He has also been referred for cognitive testing."), the special master has impermissibly ignored and thereby mischaracterized the contents of the medical records before him.

In sum, by failing to consider the full universe of medical records before him and by mischaracterizing the contents of the medical records that he did consider, the special master has abused his discretion.  Remand is therefore appropriate.[13]

### III.  CONCLUSION

For the reasons set forth above, the court **GRANTS** petitioner's motion for review, **VACATES** the special master's March 23, 2015 decision, and **REMANDS** the case to the special master for further proceedings.  On remand, the special master shall (1) reevaluate petitioner's equitable tolling argument based on the entire universe of medical records and the other evidence before him, and (2) file a new decision on respondent's motion to dismiss.[14]  The special master is encouraged to seek additional fact evidence if he deems it necessary to determine petitioner's mental health condition during the 2006 to 2009 time period.  This evidence may include testimony or a report from one of petitioner's current or previous treating

---

[13]  At oral argument, counsel for respondent, Althea Walker Davis, agreed that the case should be remanded to the special master for a full consideration of the records describing petitioner's mental health condition.  The court appreciates Ms. Davis's high degree of professional commitment to carrying out the purposes of the Vaccine Act.

[14]  The special master shall not be bound by the court's recitation of facts in this Opinion and Order, see supra Part I.B, because they are not findings of fact as contemplated by 42 U.S.C. § 300aa-12(e)(2)(B).

physicians or therapists.  It may also include other psychiatric treatment records referred to in the
medical records but not previously submitted by petitioner.[15]

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[15] Such records may include those from Daniel's Place, see Ex. 10 at 15, those from Dr.
Nassi, a psychiatrist, see Ex. 11 at 3, and those from other psychiatrists and therapists, see Ex. 3
at 4; Ex. 5 at 3; Ex. 10 at 2.