# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * * * * *
JEREMY HODGE,                        *
                                     *  No. 09-453V
              Petitioner,            *  Special Master Christian J. Moran
                                     *
                                     *  Filed:  December 21, 2015
v.                                   *
                                     *  Statute of limitations; equitable
SECRETARY OF HEALTH AND              *  tolling; mental illness;
HUMAN SERVICES,                      *  obsessive-compulsive disorder
                                     *  ("OCD"); remand.
              Respondent.            *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Clifford J. Shoemaker, Shoemaker, Gentry & Knickelbein, Vienna, VA, for petitioner;
Althea Walker Davis, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED RULING FINDING EQUITABLE TOLLING[1]

In this case under the National Vaccine Injury Compensation Program ("the Vaccine Program"), Jeremy Hodge seeks compensation for injuries he alleges were caused by hepatitis A and B vaccinations administered on March 17, 2006, and April 15, 2006.  The Secretary of Health and Human Services filed a motion to dismiss based on the Vaccine Act's statute of limitations, 42 U.S.C. § 300aa-16(a)(2).  At this stage, there is no dispute that Mr. Hodge did not file his petition within the time permitted by the statute of limitations.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

To avoid the consequence of filing outside of the statute of limitations, Mr. Hodge argues that the running of the statute should be equitably tolled.  In a March 23, 2015 decision, the undersigned rejected that argument.  However, in an Opinion and Order issued on September 9, 2015, the Court vacated that decision and remanded for additional consideration.

After additional consideration and additional evidentiary development, the undersigned concludes that Mr. Hodge has established that equitable tolling is appropriate.  As discussed below, this conclusion is premised upon an analysis of several legal issues that are novel to the Vaccine Program.

## **Procedural History**

Before describing events in Mr. Hodge's case, it is important to set forth the background law regarding the time for filing petitions in the Vaccine Program because this law has influenced the actions taken by Mr. Hodge's attorney, Mr. Clifford Shoemaker.  The Vaccine Act provides the starting point for analyzing the timeliness of petitions.  In 2009 (and now), the Vaccine Act stated that "if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or the significant aggravation of such injury."  42 U.S.C. § 300aa−16(a)(2).

Before 2009, petitioners in other Vaccine Program cases had attempted to ameliorate the consequence of the 36-month statute of limitations by relying upon two closely related doctrines:  the discovery rule and equitable tolling.  As later explained by the Federal Circuit, "discovery rules look to the knowledge of a plaintiff to determine the date upon which the statute of limitations begins to run."  Cloer v. Sec'y of Health & Human Servs., 654 F.3d 1322, 1338 (Fed. Cir. 2011) (en banc).  When petitioners invoked the discovery rule to explain that they did not file their petition within 36 months of an injury because they did not know about their potential claim, courts did not grant them relief.  E.g., Goetz v. Sec'y of Health & Human Servs., 45 Fed. Cl. 340, 341 (1999).

Unlike the discovery rule, which would modify when a cause of action accrues, equitable tolling extends the time for filing a petition.  In 2001, the

2

Federal Circuit held that the Vaccine Act was not compatible with equitable tolling.  Brice v. Sec'y of Health & Human Servs., 240 F.3d 1367, 1372 (Fed. Cir. 2001).  As discussed below, the en banc Federal Circuit overruled this aspect of Brice while Mr. Hodge's case was pending.

Against this backdrop, Mr. Hodge's mother, Erika Elson, conferred with Mr. Shoemaker on July 13, 2009.  She informed Mr. Shoemaker that Mr. Hodge received a dose of the hepatitis A vaccine on March 17, 2006, and doses of the hepatitis B vaccine on March 17, 2006, and April 25, 2006.  She apparently also told Mr. Shoemaker that after these vaccinations, Mr. Hodge "experienced various symptoms."  Pet., filed July 15, 2009, at ¶¶ 5-7.

Two days after speaking with Ms. Elson, Mr. Shoemaker filed the petition without collecting medical records.  He filed the petition "immediately because of potential statute of limitations problems."  Pet. ¶ 7.  The petition was, thus, not very specific about the injury that the vaccinations allegedly caused, and merely asserted that a May 18, 2009 MRI[2] suggested that Mr. Hodge suffered from a demyelinating disease.  Pet. ¶ 9.

At the first status conference, the parties discussed the potential statute of limitations problem, which Mr. Shoemaker had disclosed in the petition.  Nevertheless, Mr. Shoemaker wanted to continue the case, suggesting that this case might be an appropriate vehicle to modify Brice.[3]

---

[2] The petition states an MRI date of May 19, 2009, which is the date that the evaluating physician reviewed the results of the MRI.  The accurate date is May 18, 2009, the date the MRI was performed on Mr. Hodge.  For consistency, this ruling refers to the MRI as performed on May 18, 2009.

[3] Mr. Shoemaker's decision to represent Mr. Hodge was admirable.  Mr. Shoemaker knew that Mr. Hodge's case could be barred by the statute of limitations and that attempts to avoid the consequences of the statute of limitations had been rejected by the Federal Circuit.  Thus, the task confronting Mr. Hodge to establish that the merits of his claim should be adjudicated were considerable.

In addition, when Mr. Shoemaker decided to undertake this challenge, he knew that the Federal Circuit had held that special masters lacked the authority to award attorneys' fees to petitioners whose cases were filed outside the statute of limitations.  This ruling came in a

3

The parties agreed that Mr. Shoemaker should file medical records and he spent more than two years gathering them. In this phase of collecting records, the Federal Circuit issued its en banc opinion in Cloer. Two aspects of Cloer affect Mr. Hodge's case. First, the Federal Circuit confirmed that the Vaccine Act does not include a discovery rule. Cloer, 654 F.3d at 1336-40. Second, overruling Brice, the Federal Circuit determined that the Vaccine Act permits equitable tolling. Id. at 1340-44.

After Mr. Hodge's medical records were filed, the Secretary evaluated them in her report. The Secretary premised her analysis on the idea that Mr. Hodge's petition alleged that the vaccinations caused him a demyelinating disease. Resp't's Rep., filed April 30, 2012, at 13. The Secretary's report also argued that the case should be dismissed due to untimeliness. Id. at 17-19.

The next significant event was Mr. Hodge's filing a report from a neurologist, Carlo Tornatore. This report had two purposes: (1) to define the injury for which Mr. Hodge was seeking compensation, and (2) to determine when the first sign or symptom of that injury arose. After reviewing the medical records, Dr. Tornatore determined that "the diagnosis of neuroborreliosis would not be unreasonable."[4] He stated that the onset of this disease was in 2005. Dr. Tornatore also added that after Mr. Hodge received the vaccinations, his neuroborreliosis

---

second opinion from the Federal Circuit in the Brice case. Brice v. Sec'y of Health & Human Servs., 358 F.3d 865, 869 (Fed. Cir. 2004). In a second en banc decision in Cloer, the Federal Circuit overruled this Brice decision as well. Cloer v. Sec'y of Health & Human Servs., 675 F.3d 1358 (Fed. Cir. 2012) (en banc).

Thus, as the law stood in 2009, Mr. Shoemaker agreed to take on a case that would require a significant amount of work (possibly an en banc appeal), for which it was possible, if not likely, he would not receive attorneys' fees. Mr. Shoemaker's willingness to put his client's interests ahead of his own upholds the best traditions of the legal profession.

[4] Dr. Tornatore's diagnosis of neuroborreliosis means that Mr. Hodge is suffering from a manifestation of Lyme's disease. See Dorland's Illus. Med. Dictionary at 241, 1263 (32d ed. 2012). Dr. Tornatore's diagnosis is consistent with the opinions of some treating doctors' opinions that he suffered from Lyme's disease. E.g., Exhibit 7 at 22, 28, 44; exhibit 14 at 3; exhibit 20 at 16.

became worse by June 2, 2006, when he experienced dizziness and eye movement disorders.  Exhibit 18 at 2, citing exhibit 6 at 7.

In the ensuing status conference, the parties discussed the significance of Dr. Tornatore's report.  Mr. Hodge recognized that Dr. Tornatore's reliance on the June 2, 2006 dizziness and eye movement disorders placed the first manifestation of a vaccine-induced significant aggravation outside the statute of limitations.  But, Mr. Hodge wanted to argue that equitable tolling should save his claim.  Order, issued August 29, 2013.

Mr. Hodge filed his brief approximately five months later.  His primary argument was that doctors did not recognize his symptoms as manifestations of an injury caused by a vaccine.  Pet'r's Br., filed Jan. 30, 2014, at 1-2, 4.  In passing, Mr. Hodge also mentioned that mental disability could serve as a basis for equitable tolling.  Id. at 8.

The Secretary did not agree with Mr. Hodge's invocation of equitable tolling.  With respect to mental disability, the Secretary argued that Mr. Hodge had not shown how his mental illness prevented him from filing a timely petition.  Resp't's Resp., filed May 9, 2014, at 17.

Mr. Hodge was permitted to have the last word as to the availability of equitable tolling.  In his sur-reply, Mr. Hodge emphasized the extraordinary circumstances that prevented him from filing earlier and his diligence in pursuing his rights.  Pet'r's Sur-Reply, filed Oct. 1, 2014.

A decision was issued on March 23, 2015.  The decision found that based upon Dr. Tornatore's report, Mr. Hodge had not filed his petition within the time permitted by the statute of limitations.  In addition, the decision found that Mr. Hodge had not established that he was entitled to equitable tolling.  2015 WL 1779274.

After Mr. Hodge filed a motion for review, the Court vacated the March 23, 2015 decision.  The Court did not modify the finding that Mr. Hodge filed the case outside the statute of limitations.  123 Fed. Cl. 206, 216.  However, the Court remanded for a more detailed assessment of the medical records especially with respect to Mr. Hodge's mental status.  Id. at 219.

The time for remand is set forth in the Vaccine Act: "The court may allow not more than 90 days for remands." 42 U.S.C. § 300aa−12(e)(2). This provision is carried over into Vaccine Rule 28(b). Because the Court remanded the case on September 9, 2015, the time for remand was set to expire on December 9, 2015.

After the remand, the parties were ordered to file briefs addressing legal and factual questions. Order, issued Sept. 14, 2015. The parties presented their arguments in a series of briefs that are discussed in the context of specific issues below.

On October 16, 2015, Mr. Hodge filed more medical records. He also filed a report from Robert Dasher, a psychiatrist who treated him. Exhibit 22.

The October 8, 2015 scheduling order required the Secretary to file a response to Dr. Dasher's report on Friday, November 6, 2015. On that date, the Secretary filed two motions for enlargement of time. Mr. Hodge did not oppose either motion. The first (ECF entry 127) was directed to the Court, requesting an extension of time for the remand proceedings. The second (ECF entry 128) was directed to the special master, requesting an extension of time for the expert's report.

On Monday, November 9, 2015, the Court denied the Secretary's motion to enlarge the time for remand. The Court reasoned that it cannot change a deadline set by statute. Order, issued Nov. 9, 2015, at 1, citing 1 James Wm. Moore, Moore's Federal Practice ¶ 6.06[1][a] (3d ed. 2012). However, citing Paluck v. Sec'y of Health & Human Servs., 111 Fed. Cl. 160, 165-66 (2013), the Court added that "the Vaccine Act does not identify any consequence for a failure to act within the ninety-day remand period." The Court concluded that "if both parties and the special master agree that additional time is necessary for the special master to comply with the court's remand order, the court will fully support that common-sense agreement in the interest of justice." Order, issued Nov. 9, 2015, at 2.

The following day, a status conference was held to discuss the implications of the Court's November 9, 2015 order. Mr. Hodge continued to consent for additional time for the Secretary to file a response to Dr. Dasher. Thus, the Secretary's deadline was extended to November 20, 2015. Order, issued Nov. 10, 2015.

On November 20, 2015, the Secretary filed reports from Elizabeth LaRusso, a psychiatrist, and John Dunn, a neuropsychologist.  These reports provided information about obsessive-compulsive disorder and opinions about Mr. Hodge's mental health.

On December 4, 2015, Mr. Hodge filed a reply.  With the reply, he filed an additional affidavit from his mother, exhibit 26, contesting some of the factual assertions made by Dr. LaRusso and Dr. Dunn.

With that submission, the matter is again ready for adjudication.

## Analysis

The analysis follows the following structure.  The first two sections are devoted to resolving questions of law:  (1) whether petitioners in the Vaccine Program may invoke the doctrine of equitable tolling on the basis of mental incapacity, and (2) what petitioners relying upon a mental disability must establish to receive the benefits of equitable tolling.  The following section considers the pleadings and facts of Mr. Hodge's case and concludes that Mr. Hodge is entitled to equitable tolling.  Based upon the finding that Mr. Hodge's claim that he is mentally incapacitated, the final section requests briefs regarding Mr. Hodge's ability to continue to function as the petitioner in his case.

## I.    Availability of Equitable Tolling for Mental Illness

There is no question that, as a general matter, the Vaccine Act permits equitable tolling.  Cloer, 654 F.3d at 1340-44.  Although the Secretary concedes this general point, the Secretary contends that "equitable tolling for mental illness is not available in Vaccine Program cases."  Resp't's Mem., filed Sept. 30, 2015 at 7.[5]

Cloer itself does not directly address this question.  The petitioner, Dr. Melissa Cloer, sought equitable tolling "on the ground that she first became aware

---

[5] After remand, the Secretary's legal argument has matured into a prominent argument compared to the relatively tangential argument made earlier.  See Resp't's Resp. to Pet'r's Mot. for Rev., filed July 22, 2015, at 8 n.5.

of the causal link between her [multiple sclerosis] and the [hepatitis B] vaccine" after the statute of limitations had run. <u>Cloer</u>, 654 F.3d at 1344. The en banc Federal Circuit held that "unawareness of a causal link between an injury and administration of a vaccine" is not a basis for equitable tolling. <u>Id.</u> at 1345. Unlike Mr. Hodge, Dr. Cloer did not invoke mental illness as a reason for tolling the statute of limitations.

In determining whether equitable tolling is available, the starting point is <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 95-96 (1990), in which the Supreme Court "established a presumption that all federal statutes of limitations are amenable to equitable tolling absent provision by Congress to the contrary." <u>Cloer</u>, 654 F.3d at 1342. In a case the Federal Circuit cited involving equitable tolling, <u>Barrett v. Principi</u>, 363 F.3d 1316, 1319 (Fed. Cir. 2004), the Sixth Circuit stated "time limitations may be tolled on equitable grounds not inconsistent with the legislative purpose." <u>Cantrell v. Knoxville Community Development Corp.</u>, 60 F.3d 1177, 1179 (6th Cir. 1995).

Citing the Vaccine Act, the Secretary argues that Congress did not intend for mental illness to be a basis for equitable tolling in the Vaccine Program. The Vaccine Act identifies three groups of people who may be petitioners in the Vaccine Program: "[(1)] any person who has sustained a vaccine-related injury, [(2)] the legal representative of such person if such person is a minor or is disabled, or [(3)] the legal representative of any person who died as the result of the administration of a vaccine set forth in the Vaccine Injury Table." 42 U.S.C. § 300aa–11(b)(1)(A); <u>but see</u> <u>Figueroa v. Sec'y of Health & Human Servs.</u>, 715 F.3d 1314, 1322-25 (Fed. Cir. 2013) (authorizing the legal representative of a person who died from non-vaccine related causes to file a petition for a vaccine-related injury). The Secretary's argument regarding equitable tolling is based upon the second class: "the legal representative" of a vaccine-injured person who is "disabled." The Secretary essentially argues that because Congress authorized the legal representative of a disabled person to file a petition, Congress did not want the disabled person to have the benefit of equitable tolling. In the Secretary's words, the Vaccine Act "empowers the legal representative of a disabled person with the right and obligation to advance [a] Vaccine Act claim." Resp't's Mem. at 9; <u>accord</u> Resp't's Br., filed Nov. 20, 2015, at 8 n.6, 10.

8

Mr. Hodge did not directly respond to the Secretary's citation to the Vaccine Act.  See Pet'r's Mem., filed Oct. 16, 2015.  This omission is unfortunate because the Secretary's argument carries some force.  Despite the lack of response from Mr. Hodge, the Secretary's argument is not persuasive.

The Secretary argument leaves unaddressed two questions.  First, who is the "legal representative"?  The Vaccine Act defines "legal representative" as "a parent or individual who qualifies as a legal guardian under State law."  42 U.S.C. § 300aa–33(2).  The Court of Federal Claims construed the term "legal representative" to mean that "parents are always viewed as the legal guardian of a son or daughter, whether or not they also qualify as such under state law." Kennedy v. Sec'y of Health & Human Servs., 99 Fed. Cl. 535, 542 (2011), aff'd without op., 485 F. App'x 435 (Fed. Cir. 2012); cf. Bernhardt v. Sec'y of Health & Human Servs., 82 Fed. Cl. 290, 291 (2005) (determining only that a non-custodial parent possessed the right to sue on behalf of the child under Maryland law and refraining from determining the right apart from state law).  Notably, Kennedy's interpretation of "legal representative" came in the context of a case in which the parents of Michael Kennedy filed a petition while their son was a minor.  Kennedy, 99 Fed. Cl. at 538.  The question was whether Michael's parents could continue to prosecuting Michael's Vaccine Program claim after he turned 18 as "next friend." The Court said that the parents could continue to act as petitioners because, in part, Michael was disabled.  Id. at 542.

Thus, Kennedy supplies some support for an argument that Mr. Hodge's mother (Ms. Elson) could act as the "legal representative" of Mr. Hodge due to his disability.  (In contrast, Ms. Elson could not have initiated the lawsuit in her capacity as Mr. Hodge's "parent" because the Vaccine Act authorizes the parent of a minor to file suit and Mr. Hodge was not a minor when he was vaccinated.) However, it is not absolutely clear whether a person — even a mother — may file a Vaccine Program petition for a disabled person without first establishing his or her status as a "legal representative" under the pertinent state law.  Spates v. Sec'y of Health & Human Servs., 76 Fed. Cl. 678, 681 n.1 (2007) (recognizing an ambiguity in "whether a parent is a legal representative per se, irrespective of state law, or whether a parent must simultaneously qualify as a legal guardian under state law to be a legal representative under the Act").

If, for the sake of argument, it is assumed that Ms. Elson qualifies as Mr. Hodge's "legal representative" without ever actually having been appointed as a legal representative, that answer only leads to the second question, which is even more difficult. The Secretary's argument is that the Vaccine Act "empowers the legal representative of a disabled person with the right and the obligation to advance [a] Vaccine Act claim." Resp't's Mem. at 9. The critical word is "obligation." The Vaccine Act grants the "legal representative" a "right" to file a petition. But, saying there is a "right" to do something is not the same as saying there is an "obligation" to do it.

On this point, Mr. Hodge cited two cases that address responsibility for initiating litigation when the injured person is an incapacitated adult for whom a legal guardian has not been appointed. The older case is Clifford ex rel. Clifford v. United States, 738 F.2d 977 (8th Cir. 1984).

In October 1976, Allen Clifford was 24 years old and suffering from depression with suicidal tendencies. Physicians from the Veteran Administration prescribed a medication and Allen Clifford overdosed on that medication, leading to a coma. In January 1979, Mr. Clifford's father, Dewey Clifford, was appointed as his son's guardian. Shortly less than two years later, Mr. Clifford filed an administrative claim. The issue in litigation was whether the claim was timely filed.

Reversing the district court, the Eighth Circuit held that the cause of action did not accrue in October 1976, when the alleged negligence took place. Instead, the Court of Appeals held that the cause of action accrued when the guardian was appointed for two reasons. First, the circuit court found significant that the complaint alleged that the defendant's negligence prevented Allen Clifford from knowing he was harmed and from filing the lawsuit. The circuit court did not want to let the United States benefit from an alleged wrong. Second, "Allen was an emancipated adult, and neither his girlfriend nor his family had a legal duty to act on his behalf." Id. at 979.

Clifford was a basis for the second case Mr. Hodge cited: Miller v. Philadelphia Geriatric Center, 463 F.3d 266 (3d Cir. 2006). Henry Miller suffered from developmental delay throughout his life. "Despite this severe impairment, no one was ever appointed his legal guardian." Id. at 268. In 1988, one of Henry's

10

doctors prescribed medications.  In October 1995, an attending physician at another hospital told Henry's sister, Vicki Miller, that these medications were harming Henry.  After Henry died in 1997, Ms. Miller initiated legal actions against various entities, including the United States.  Id. at 269.

The question on appeal was whether the two-year statute of limitations found in the Federal Tort Claims Act barred the causes of action.  The government argued that the survivor claim accrued in October 1995 when Ms. Miller became aware of the injury.  Ms. Miller argued for September 24, 1997, the date Henry Miller died.  Id. at 272-73.  A divided panel of the Third Circuit held that the later date was the date of accrual for the survivor claim.  The Third Circuit explained:

> Miller argues that the District Court erred by looking to her rather than to the decedent as the proper person to whom the reasonable person standard of the FTCA discovery rule applies. We agree.
>
> The record is quite clear that, although Miller closely monitored her brother's health and treatment, she was not his legal guardian.  Even though she was not his legal guardian, the District Court nonetheless looked to Miller to determine when any lawsuit should have been filed.  This was error.  Miller would not have had the authority to file a suit on the decedent's behalf while he was alive unless she was appointed his guardian.

Id. at 273.

Procedurally, neither Clifford nor Miller is entirely on all fours with Mr. Hodge's case because both Clifford and Miller were concerned with when the cause of action should have been discovered pursuant to the Supreme Court's decision in United States v. Kubrick, 444 U.S. 111 (1979).  Because the discovery rule does not delay the start of the accrual of the statute of limitations for the Vaccine Act, Cloer, 654 F.3d at 1340, Mr. Hodge is not pursuing an argument based on when he discovered that the vaccines injured him.  Nonetheless, Clifford and Miller illustrate the point that Ms. Elson lacked the authority to file a petition

11

for Mr. Hodge until she was appointed guardian.[6]   The Secretary did not address either <u>Clifford</u> or <u>Miller</u>.  <u>See</u> Resp't's Br., filed Nov. 20, 2015.

The Secretary's interpretation of the Vaccine Act would create an unworkable system.  An unappointed "legal representative" would be required to file a lawsuit on behalf of a disabled person whom he or she did not know he or she was representing.  The text of the Vaccine Act does not suggest that Congress intended to limit the opportunities for disabled people to bring claims on their own behalf.  The Secretary's legal argument is not consistent with general principle of equity that underlie the equitable tolling doctrine.

Consequently, petitioners in the Vaccine Program may invoke equitable tolling based upon mental illness.  Whether Mr. Hodge's request for equitable tolling fulfills the requirement of extraordinary circumstances must be analyzed according to the facts and evidence.

## II.    Legal Standard

The second legal question is: in cases involving a claim for equitable tolling due to mental incapacity, what must the claimant show?  The parties agree that the starting point, at least, is <u>Barrett</u>.

In <u>Barrett</u>, the Federal Circuit interpreted 38 U.S.C. § 7266(a), which establishes a 120-day deadline for an appeal from the Board of Veterans' Appeals to the Court of Appeals for Veterans Claims, to allow for claims of equitable tolling based on mental illness.  363 F.3d at 1318.  The Federal Circuit stated that to gain the benefit of equitable tolling, "a veteran must show that the failure to file was the direct result of mental illness that rendered him incapable of 'rational thought or deliberate decision making,' . . . or 'incapable of handling [his] own affairs or unable to function [in] society.'"  <u>Id.</u> at 1321 (citations omitted).

---

[6] For additional views on whether the appointment of a guardian for a mentally incompetent adult should toll the running of the statute of limitations, <u>see</u> William M. Schrier, <u>The Guardian or the Ward:  For Whom Does the Statute Toll?</u>, 71 B.U. L. Rev. 575 (1991).

The Secretary stated that <u>Barrett</u> "does establish the test for determining whether mental illness may toll the statute of limitations." Resp't's Mem., filed Sept. 30, 2015, at 10 (capitalization changed without notation).[7] Mr. Hodge describes <u>Barrett</u> as "instructive," but believes that there should be a "totality of the circumstances" test. Pet'r's Mem., filed Sept. 30, 2015, at 2.

Mr. Hodge's argument to add to the test set forth in <u>Barrett</u> is not necessary. The various factors that Mr. Hodge identifies, such as a lack of ability to communicate and lack of ability to complete life's activities, are simply aspects of being "incapable of handling his own affairs."

When a claimant establishes that he is "incapable of handling his own affairs," the claimant is entitled to equitable tolling. Significantly, a mentally ill person is not required under <u>Barrett</u> to demonstrate due diligence in pursuing legal remedies. The Federal Circuit was certainly aware that "due diligence" was a factor in claims for equitable tolling as the government had argued that equitable tolling was limited to two situations, including when the claimant has "actively pursued his judicial remedies." <u>Barrett</u>, 363 F.3d at 1318, quoting <u>Irwin</u>, 498 U.S. at 96. However, the Federal Circuit did not incorporate any diligence requirement in defining what a person with a mental illness must show to gain the benefit of equitable tolling.

Requiring mentally ill claimants to show both that they were not capable of rational decision-making and that they were diligent in pursuing their legal rights would be like attempting to fit a square peg into a round hole. A person whose mental illness is so debilitating that he (or she) cannot function in society is highly unlikely to be capable of filing any sort of petition. Conversely, any steps to advance the legal claim would likely be considered evidence that the person could handle his (or her) affairs. For these reasons, claimants for equitable tolling based

---

[7] In the context of arguing whether equitable tolling for mental illness is consistent with the Vaccine Act, the Secretary attempted to distinguish <u>Barrett</u>, a case arising in the veterans' context, from the present Vaccine Program case. This decision does not address <u>Barrett</u> in that context because the Vaccine Act answers the question. <u>See</u> section I above.

upon mental illness are not required to show diligence.  They must fulfill only the standard set forth in Barrett.[8]

## III.   Facts

The previous two sections addressed issues of law — whether the Vaccine Act permits equitable tolling based upon a disability and whether petitioners with a disability are required to show diligence in pursuing their legal rights.  The remainder of the decision places these rulings in the context of Mr. Hodge's case, both in terms of the pleadings and the evidence.

### A.   Pleadings

Before addressing the evidence related to whether Mr. Hodge lacked the capacity to manage his own affairs, the undersigned considers first the Secretary's argument that would obviate this examination.  The Secretary contends that Mr. Hodge has admitted that the reason he did not file his petition sooner was that he did not know that a vaccine injured him until July 2009.

The legal basis for the Secretary's argument is the declaration that "equitable tolling under the Vaccine Act due to unawareness of a causal link between an injury and administration of a vaccine is unavailable."  Cloer, 654 F.3d at 1345.

---

[8] Mr. Hodge argues that he met any requirement for diligence.  See Pet'r's Mem., filed Oct. 20, 2015, at 6-9.  He asserts that: "In the vaccine injury context, pursuing one's rights means visiting health care facilities that are available to that particular petitioner."  Id. at 7.  However, it is far from clear that for purposes of qualifying for equitable tolling, diligence in seeking medical attention qualifies as diligence in pursuing legal remedies.  See Resp't's Br., filed Nov. 20, 2015, at 3 ("There is no basis to equate the pursuit of medical care with the pursuit of legal rights through reasonably diligent efforts to timely file a claim").  For one example of diligence in pursuing legal remedies that qualified for equitable tolling, see Mojica v. Sec'y of Health & Human Servs., 102 Fed. Cl. 96 (2011) (recognizing equitable tolling when petitioner's attorney delivered the petition to an express mail service that lost the petition).

Both parties recognize this restriction for equitable tolling.  See Pet'r's Br., filed Dec. 4, 2015, at 1-2, Resp't's Br., filed Nov. 20, 2015, at 7.

The factual basis for the Secretary's argument is a series of statements Mr. Hodge made early in the litigation.  See Resp't's Mem., filed October 1, 2014, at 3-7, Resp't's Br., filed Nov. 20, 2015, at 7.  These statements begin with the petition:  "Up until now [July 2009], doctors have told Jeremy and his mother that the symptoms he has been describing were probably due to mental issues, so they have had absolutely no reason to suspect that he has had a vaccine related injury." Pet., filed July 15, 2009, at ¶ 9.  The petition also explains that the event that alerted Ms. Elson to the possibility that a vaccine injured her son was an MRI conducted on May 18, 2009.  Id.[9]; accord Pet'r's Mem., filed Jan. 31, 2015, at 10 (the "MRI was crucial to the doctor's determination that [Mr.] Hodge had an injury rather than a mere psychosis").

Three years after his petition was filed, Mr. Hodge continued to make statements that suggested his failure to file within the time the statute of limitations permitted was due to an unawareness that a vaccine caused his injury.  When Mr. Hodge responded to the Secretary's argument that his case should be dismissed due to an untimely filing, Mr. Hodge asserted that "none of the medical professionals who treated Jeremy objectively recognized his complaints of rapid eye-movement, numbness, dizziness, joint and back pain, headache, or behavior changes as a first symptom, onset, or sign of vaccine injury nor did they recognize a vaccine-induced aggravation of a pre-existing condition."  Pet'r's Mem., filed

---

[9] Medical records, which were collected after the petition was filed, show that there was suspicion that a vaccine caused an injury much earlier.  In August 2006, Dr. Baca, at Encino-Tarzano Regional Medical Center, recorded that Mr. Hodge said his "symptoms have been evident intermittently since receiving hepatitis vaccine earlier this year."  Exhibit 4 at 13. Approximately one year later, in September 2007, a medical record again reflects that "The mother is concerned about possible side effects from previous hepatitis vaccinations."  Exhibit 8.5 at 72.

Mr. Hodge used these statements to argue that "Ms. Elson was duly diligent in advocating for her son's rights because she consistently expressed during each doctor visit that [Mr.] Hodge experienced severe health problems following the Hepatitis vaccinations."  Pet'r's Mem., filed Jan. 15, 2015, at 9-10.

Jan. 30, 2014, at 1-2.  Mr. Hodge repeated this later in his brief:  none of Mr. Hodge's various symptoms

> were indicative of a vaccine-related aggravation of a pre-existing condition to the medical profession at large because - despite Mrs. Elson's efforts to emphasize to doctors that Hodge's condition worsened following these vaccinations - Hodge's various doctors continued to find unrelated diagnoses. . . . Only after Hodge's MRI in 2009, three years after he received the vaccinations in 2006, did the doctors responsible for treating Hodge determine he even had an injury

Id. at 6-7.  Mr. Hodge again emphasized his lack of knowledge when he argued that before the 2009 MRI, he "was unaware and lacked evidence of his underlying neuroborreliosis to conclude the Hepatitis B vaccine caused a sequela of that condition."  Id. at 12.

Thus, the clear thrust of Mr. Hodge's initial response to the motion to dismiss was to argue for something like the discovery rule.[10]  He changed tack in his sur-reply.  There, he argued for equitable tolling based upon his "due diligence in attempting to file his claim in spite of extraordinary circumstances."  Pet'r's Reply, filed Oct. 1, 2014, at 4 (capitalization changed without notation).

On remand, the Secretary, as noted above, cites some of these assertions as a basis for arguing that Mr. Hodge "admits that his petition was filed late because he was unaware that he may have suffered a vaccine-related injury."  Resp't's Mem., filed Oct. 1, 2015, at 5.  If it were correct that Mr. Hodge's lack of awareness caused him to miss the deadline for filing within the statute of limitations, then equitable tolling could not save his action.  Cloer, 654 F.3d at 1345.

In juxtaposition, Mr. Hodge argues that his "mental illness caused his untimely filing, not his lack of awareness of his injury."  Pet'r's Mem., filed Oct.

---

[10] In a single sentence of his brief, Mr. Hodge mentioned mental disability and cited Barrett.  See Pet'r's Mem., filed Jan. 31, 2014, at 8.

16, 2015, at 14 (capitalization changed without notation).  However, the remainder of the section below this heading does not develop this argument very significantly.  Mr. Hodge's response to the Secretary's arguments regarding statements in his petition is found later on pages 22-26.  In that section, Mr. Hodge argued that the precedent controlling the interpretation of the statute of limitations that was effective on July 15, 2009, recognized a discovery rule.  See id. at 22-26, citing Markovich v. Sec'y of Health & Human Servs., 477 F.3d 1353 (Fed. Cir. 2007).  Markovich, however, did not endorse the discovery rule.  In linking Markovich and the discovery rule, Mr. Hodge, as the Secretary stated, "misunderstands the holding."  Resp't's Br., filed Nov. 20, 2015, at 8 n.5.

The parties' arguments demonstrate a conundrum in the interplay between the discovery rule and equitable tolling for mental illness.  See Garcia v. Brockway, 526 F.3d 456, 465 (9th Cir. 2008) (en banc) (differentiating discovery rule and equitable tolling but recognizing they are frequently confused); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1388 (3d Cir. 1994) (application of the discovery rule and equitable tolling "invite confusion"); cf. Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc) (discussing equitable tolling and accrual rule).  When Mr. Hodge thought that the discovery rule would delay the accrual of the statute of limitations, he made assertions that suggested that he did not know about his vaccine injury.  See Pet. ¶ 9.  After the en banc Federal Circuit held that the Vaccine Act was not consistent with the discovery rule in Cloer, the Secretary argues that Mr. Hodge is still trying to assert the discovery rule based upon initial pleadings.  Resp't's Mem., filed Sept. 30, 2015, at 5.

Mr. Hodge's pleadings from before the motion for review can be seen as inconsistent with his current position.  In his petition and in his argument against the motion to dismiss, he seems to have admitted that his lack of knowledge that a vaccine injured him caused him to delay filing his petition until after the May 2009 MRI.  Pet. ¶ 9, Pet'r's Mem., filed Jan. 30, 2014, at 1-2, 6-7, 12.[11]  However, not

---

[11] Mr. Hodge attempted to explain the statements appearing in his 2009 petition by arguing that they were consistent with Markovich.  While there are some questions about the soundness of this argument, Mr. Hodge can use Markovich to excuse only the statements made in 2009.  Mr. Hodge has not attempted to explain why his arguments in his 2014 brief continued

all admissions constitute binding admissions.  See Paice LLC v. Toyota Motor Corp. 504 F.3d 1293, 1312 (Fed. Cir. 2007) (finding that in a patent infringement case, the district court did not err in treating "the statement as merely an evidential admission — as opposed to a conclusive admission").

Rather than finding that Mr. Hodge's claim for equitable tolling fails simply because his pleadings focused on the wrong legal theory, the undersigned will consider all the evidence.  See 42 U.S.C. § 300aa−13.

## B.    Medical Records and Expert Commentary on Them

On remand, the parties have presented thorough accounts of Mr. Hodge's medical history, emphasizing his mental condition.  In addition, the parties retained individuals to offer opinions about Mr. Hodge's competency.  Before authoring their reports, Dr. Dunn and Dr. LaRusso reviewed Mr. Hodge's medical records. Exhibit A at 1, exhibit C at 2-4.  Their reports provide helpful information about Mr. Hodge's mental status during the critical time from 2006 through July 2009. In contrast, Dr. Dasher did not identify what records he reviewed and did not cite any medical records.[12]  This lack of specificity limits the usefulness of Dr. Dasher's report, although Dr. Dasher apparently treated Mr. Hodge at Olive View in mid-2008.[13]

The undersigned has reviewed the reports of Dr. Dasher, Dr. Dunn, and Dr. LaRusso.  Their commentary upon Mr. Hodge's symptoms are provided in the context of the following chronology.  The recitation of Mr. Hodge's history begins before his vaccination to provide context for later events.  The review of the

---

to be based upon his lack of knowledge, an argument that the en banc Federal Circuit rejected in Cloer in 2011.

[12] Dr. Dasher states that Mr. Hodge has had a limited ability to perform daily activities and "[t]his process has been going on for years prior to seeing me by my review of his records." Exhibit 22 at 1.

[13] Dr. Dasher has explained the lack of records from his treatment of Mr. Hodge in mid-2008 by noting that a fire destroyed medical records at Olive View.  Exhibit 27.  The undersigned has confirmed that in November 2008, the Sayre Fire destroyed a building at Olive View that housed medical records.  Exhibits 1000-01.

medical history stops shortly after the petition was filed in July 2009, because events temporally distant from the date the petition was filed are not likely to provide information relevant to Mr. Hodge's mental capacity in the time covered by the statute of limitations.

### 1.    From Birth through Vaccinations

Mr. Hodge was born on May 17, 1987.  Exhibit 3.  According to a record created in 2007, Mr. Hodge's family had a "strong family [history of] mental illness."  Exhibit 11 at 3.  This record states that Mr. Hodge's father suffered from bipolar disorder and attention deficit disorder (ADD).  Id.; see also exhibit 5 at 2.  A grandmother was a "hoarder."  Exhibit 11 at 3; see also exhibit 5 at 2 (indicating a grandparent possibly had obsessive-compulsive disorder (OCD)).  Another record states Mr. Hodge's great-grandfather and grandfather were both diagnosed with bipolar disorder.  Exhibit 10 at 2; see also exhibit 10 at 69 (slightly different family history of mental illness), exhibit 14 at 442.

The medical records from Mr. Hodge's pediatrician dating back to his early years recount relatively routine illnesses associated with childhood.  See exhibit 3, passim.  On September 28, 2004, when Mr. Hodge was 17 years old, Ms. Elson called the pediatrician to report that her son "was put on Adderall per psych."  Exhibit 3 at 4.  The specific reason for Adderall was not given in the pediatrician's record.

According to records created years later, in December 2009, Mr. Hodge was bitten by a tick while hiking in Big Sur.  Exhibit 7 at 22.  The tick bite was not treated.  Id. at 34.  Later records tend to associate a decline in Mr. Hodge's functioning with the tick bite.  Id. at 22, 45-46; exhibit 13 at 15.

At the age of 18, Mr. Hodge appeared at Noble Community Choice Provider Medical Group for an adolescent health maintenance exam.  Exhibit 5 at 2.  It appears that Mr. Hodge completed a "'STAYING HEALTHY' ASSESSMENT."  Id. at 5.[14]  In response to the question do you "[o]ften feel sad, down, or hopeless,"

---

[14] The assessment consists of a series of questions to which one completing the assessment answers the question by placing a check in the box "no," "yes," or "skip."

Mr. Hodge checked the box marked "yes."  Id.  The doctor's handwritten notes, which are difficult to read, indicate that Mr. Hodge was positive for OCD, which started at age 17 years.  Id. at 2.  The plan included vaccinations against hepatitis A and hepatitis B.  Id. at 2, 7.

On April 25, 2006, Mr. Hodge returned to Noble Community.  Exhibit 5 at 3.  The intake portion of the form indicates that Mr. Hodge was returning for follow-up.  Id.  The remainder of the form is difficult to understand.  However, the plan for a second dose of the hepatitis B vaccination is clear.  Id. at 3, 7.

Dr. Dunn's opinion is that Mr. Hodge did not lack capacity to function before he was vaccinated.  Although Mr. Hodge had already been diagnosed with OCD, "this diagnosis does not equate to a lack of capacity."  Exhibit C at 6.

## 2.   Alleged Initial Adverse Reaction to Vaccinations – June 2006

On June 2, 2006, Mr. Hodge and Ms. Elson appeared at the emergency department at Valley Presbyterian Hospital.  Exhibit 6 at 1-12.  Mr. Hodge's chief complaint was "dizzy/eye movement disturbances."  Id. at 7.  In addition to these problems, the history of present illnesses stated that Mr. Hodge had "back pain, joint + muscle aches and fatigue since receiving Hep B + A vaccinations 4 mos ago."  Id.  Ms. Elson also reported that blood tests were done and they were normal.  Id.  The review of symptoms showed that Mr. Hodge was having frontal headaches and dizziness.  Id.  For the physical examination, Mr. Hodge was oriented x 3 with an intact memory.  Id.  However his affect was "flat," not normal.  Id.  The doctor ordered a CT scan of the brain without contrast.  Id. at 10.  The result was normal.  Id.

At discharge, which occurred a few hours after admission, Mr. Hodge's condition was reported as "improving" and "good."  Id. at 6.  The doctor indicated that discharge instructions were given for Mr. Hodge to follow-up with his "PMD," which may stand for "primary medical doctor."  Id.  In addition, the doctor indicated that with respect to the continuity of care, "[significant other] demonstrates understanding."  Id.  Additionally, the doctor noted in the end of visit summation that the "mother verbalyzed [sic] understanding."  Id.  The diagnosis

was "1: Dizziness 2: Arthralgias – Myalgias [status post] Hepatitis Vaccination." Exhibit 6 at 6.

In this litigation, the doctor whom Mr. Hodge retained, Carlo Tornatore, opined that the dizziness and abnormal eye movements that were reported on June 2, 2006, constituted an aggravation of Mr. Hodges "underlying autoimmune demyelinating disorder." Exhibit 18 at 2.[15]  Because these symptoms triggered the accrual of the statute of limitations, Mr. Hodge should have filed his petition by June 2, 2009.  However, he did not file his petition until approximately six weeks later, on July 15, 2009.  Thus, the statute of limitations bars his action unless Mr. Hodge can establish that he is entitled to equitable tolling due to his mental illness.

As to Mr. Hodge's mental capacity in June 2006, Dr. Dunn stated that "[t]here was no indication of significant cognitive or mental impairment that would indicate a lack of capacity."  Exhibit C at 6.  Dr. LaRusso also opined that the record from this visit showed "no evident deficits in orientation or memory." Exhibit A at 7.

### 3.   Emergency Room Visit – August 2006

The next medical record reporting some information about Mr. Hodge's mental status was created in August 2006.  On August 23, 2006, accompanied by his mother, Mr. Hodge went to the emergency department at Encino-Tarzana Regional Medical Center.  Exhibit 4.  Mr. Hodge reported that he was feeling weak and tired.  Id. at 4.  Mr. Hodge also stated "'it's hard to feel my skin.'"  Id.  Ms. Elson stated that his problems "all started [after] Hepatitis vaccine."  Id.  The intake nurse recorded that Mr. Hodge was "oriented x 3," and "alert."  Id.  His speech was "appropriate."  Id.  Under psychological, the nurse checked "lethargic." Id.  Mr. Hodge had a score of 15 on the Glasgow Coma Scale.  Id. at 5.  The Glasgow Coma Scale assesses the response to stimuli in neurologically impaired people.  Dorland's at 1672.

---

[15] Although Dr. Tornatore has opined that Mr. Hodge suffers from an "autoimmune demyelinating disorder," Mr. Hodge's treating doctors have not settled upon a diagnosis for him.

At Encino-Tarzana, Dr. Ralph M. Baca evaluated Mr. Hodge.  Id. at 12-13.
In addition to receiving a history from Mr. Hodge and his mother that was
consistent with the history created by the intake nurse, Dr. Baca conducted a
review of systems.  Id. at 12.  For psychiatric symptoms, Dr. Baca stated that Mr.
Hodge "denies any depression, anxiety or hallucinations."  Id.  After receiving
results from laboratory studies, Dr. Baca discharged Mr. Hodge with an impression
that he suffered from a "neuropathy, etiology uncertain."  Id. at 13.  Dr. Baca
recommended that Mr. Hodge follow-up with a private physician.  Id.

Dr. Dunn interpreted this record as indicating "an absence of severe
impairment and show[ing] he had capacity."  Exhibit C at 7.  This report was
based, in part, on the Glasgow Coma Scale assessment that showed Mr. Hodge did
not have altered or diminished consciousness at that time.  Id.  Dr. LaRusso stated
Mr. Hodge's mental capacity in this visit was reasonably similar to his capacity in
the prior visit on June 2, 2006.  Exhibit A at 7.

There are no medical records created after Mr. Hodge's discharge from
Encino-Tarzana until July 10, 2007.  See exhibit A at 2 (Dr. LaRusso's assertion of
no records), exhibit C at 8 (Dr. Dunn's assertion of no records).  However, Mr.
Hodge's attorney asserts that during this period, Mr. Hodge's condition "declined
rapidly."  Pet'r's Mem., filed Sept. 30, 2015, at 16.

## 4.   West Valley Mental Health Center – July 2007

On July 10, 2007, C. Collins, RN, completed a multipage "adult initial
assessment" for West Valley Mental Health Center.  Exhibit 11 at 3-8.  Nurse
Collins provided information that is helpful in determining Mr. Hodge's mental
state approximately one year after receiving the vaccinations.

Mr. Hodge completed schooling through only the 10th grade.  Id. at 3.  He
has no history of working.  Id. at 6.  He was living with his mother and
grandmother.  Id.  His mother and father were separated with his father living in a
nearby town.  Id.; see also exhibit 10 at 59 (describing Mr. Hodge's upbringing,
education, and work history).

22

Mr. Hodge was being seen by a private psychiatrist, Dr. John Nasse. Exhibit 11 at 3. Dr. Nasse prescribed Xanax. Id.[16] A family friend referred Mr. Hodge to West Valley Mental Health Center. Id.

Nurse Collins recorded that Mr. Hodge's presenting problem was a two-year history of OCD that presented as "taping, cutting, [and] counting." Exhibit 11 at 3. The remainder of Nurse Collins's notes provides additional details.

> [History] of depression. Took Zoloft (4wks) made him worse, Prozac made him feel suicidal, Racing thoughts [with] counting. No current SI [suicidal ideation]. Not sleeping, argumentative at times. No good sleeping, naps during day, sometimes sleeps too much. Very pale (+), psychosis, seeing [illegible]. "It's bad air, environmental."

Id.

Nurse Collins completed a mental status evaluation in which she described him as "not stable." Exhibit 11 at 7. The form for the mental status evaluation is divided into 3 columns with different components and an associated list of words. The following words are circled:

General Description
     Grooming and Hygiene: Disheveled
     Eye Contact: Erratic
     Motor Activity: Restless
     Speech: Soft, Slowed, Poverty of Content
     Interactional Style: Guarded / Suspicious
     Orientation: Disoriented: Time
     Intellectual Functioning: Impaired
     Memory: Impaired, Remote
     Fund of Knowledge: Average

---

[16] Mr. Hodge was not successful in attempting to obtain records from Dr. Nasse. Pet'r's Status Rep., filed Nov. 12, 2015.

Mood and Affect
      Mood: Irritable, Anxious, Known stressor
      Affect: Constricted, Blunted, Flat
Perceptual Disturbances
      Hallucinations: Visual, Auditory, other
      Self-Perceptions: Ideas of reference
Perceptual Disturbances
      Hallucinations: Visual, Auditory, other
      Self-Perceptions: Ideas of reference
Thought Process Disturbances
      Associations: Loose
      Concentration: Impaired, Thought blocking, Clouding of
      Consciousness, Fragmented
      Abstractions: Concrete
      Judgements: Impaired between moderate and severe
      Insight: Impaired between moderate and severe
      Serial 7's: Poor
Thought Content Disturbance
      Delusions: Persecutory, Paranoid
      Ideations: Suspicious, Magical thinking
      Behavioral Disturbances: Display of anger, Antisocial
      Suicidal / Homicidal: Denies Ideation only
      Passive: Isolated, Withdrawn
      Other: No words circled

Id.

Nurse Collins diagnosed him with "psychosis NOS" and "OCD." Id. at 8. Mr. Hodge's Global Assessment of Functioning ("GAF") was 30. Id. She recommended him for a medical evaluation and case management. Id.

As part of this process, a physician reviewed Mr. Hodge's chart. Dr. Shanthi Kesham also diagnosed Mr. Hodge with a psychotic disorder NOS and OCD. Id. at 14. She prescribed Xanax and Seroquel. Id. at 15.

Although the intake information from West Valley Mental Health Center was very thorough, information about actual treatment seems sparse.  There is a single page of progress notes, indicating that Mr. Hodge had not returned for further services and the case was closed on January 8, 2008.  Exhibit 11 at 13.

Dr. Dunn indicated that the visit to West Valley "was in response to a recent escalation of symptoms and a psychotic break Mr. Hodge experienced."  Exhibit C at 8.  Dr. Dunn noted that Mr. Hodge was prescribed an antipsychotic medication and an anti-anxiety medication that he had not taken previously.  Id.  In Dr. Dunn's opinion, around July 10, 2007, "Mr. Hodge became severely impaired and lacked capacity."  Id.

Dr. LaRusso explained that a GAF of 30 meant that "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas."  Exhibit A at 7.  Dr. LaRusso stated that by July 2007, Mr. Hodge "is experiencing a significant psychiatric decompensation."  Id.

## 5. Emergency Department Visit at West Hills Hospital – September 2007

On September 9, 2007, Mr. Hodge went to the emergency department at West Hills Hospital and Medical Center.  Exhibit 8 at 53-78.  He was complaining about pain in his chest that was radiating to his left arm and a sore throat.  Id. at 57.  His past medical history included OCD and depression.  Id.

The typed report authored by the emergency room physician, Alan Kuban, indicates that the chest pain was not particularly significant.  Exhibit 8 at 76-77.  However, Dr. Kuban also comments on Mr. Hodge's mental health.  Dr. Kuban indicated that:

> The patient is [an] extremely vague historian.  The mother almost controls the situation and provides the history.  The patient really is less than forthcoming as far as descriptions and appears to be unable to make a cogent history as far as quality of his discomfort, or length of time.

25

> The mother says the patient has a long-standing history of OCD and that his brain is moving so quickly that he is almost paralyzed as far as being able to respond.  He has had psychiatric intervention in the past. He was recently started on dextrostat for possible ADHD.[17]  He has noted palpitations however since that time.
>
> * * *
>
> The mother also relates the child has had a significant change in his personality over the last 18 months.  She believes this may be related to previous hepatitis vaccinations. . . .  No primary physician.

Id.  With respect to medical decision-making, Dr. Kuban stated that Mr. Hodge "clearly has significant impairment due to his OCD." Id. at 77.  Dr. Kuban recommended follow-up with a neurologist, possibly at Olive View Medical Center.  He provided instructions and documents to Ms. Elson. Id. at 75, 78.

Dr. Dunn provided relatively little analysis of the record from West Hills. Dr. Dunn stated:  "While he presented as significantly impaired on 9/9/07, and required assistance from his mother with respect to providing a history of his condition, he was assessed as alert, fully oriented, and with 'cognitive/safety/judgment' intact." Exhibit C at 10.  On the other hand, Dr. LaRusso stated that Dr. Kuban's note does not reflect a "mental status/cognitive exam." Exhibit A at 8.

### 6.    San Fernando Transitional Youth – November 2007 through February 2008

Approximately two months later, Mr. Hodge and his mother met with Theresa Kieldgaard, a program manager at the transitional youth outpatient service of San Fernando Valley Community Mental Health Center ("Transitional Youth").

---

[17] Through his attorney, Mr. Hodge stated that Dr. Nasse prescribed dextrostat.  But, again, Dr. Nasse's records have not been obtained.  Pet'r's Status Rep., filed Nov. 12, 2015.

Exhibit 10.  The form for "adult initial assessment" matched the form used at West Valley Mental Health Center and the information contained on both forms is similar.  Compare exhibit 11 at 3-8 with exhibit 10 at 2-7.  Ms. Kieldgaard stated: "It is reported that there has been some improvement in client condition since beginning to take anti-psychotic medications, even though his symptoms persist. Client's mother states that he has been much worse in the past."  Exhibit 10 at 2.

Ms. Kieldgaard's initial assessment, which occurred on November 16, 2007, provided the following information about Mr. Hodge's current status.

> Client reports that he "counts everything," to include words spoken, letters in words, scenes from TV.  It is reported that anything "associated with a bad number, is contaminated."  Client will not touch anything metal due to "contamination," and will not speak about his medications, past or present, as this contaminates them. Client engages in repetitive actions, which include his walking back and forth without purpose, and touching things numerous times, tapping out rhythms in number sequences.  Client further chants things in order, and engages in ritualized behaviors around mundane acts, just brushing teeth, and getting into bed.  Client reports intrusive thoughts, which take the form of violent thoughts and images, of "weapons in the air," violence happening to self or family, and "enemies" in his head.  It is reported that client is "scared of everything."

Id.

Consistent with the conclusions that other mental health professionals had reached, Ms. Kieldgaard diagnosed Mr. Hodge as suffering from obsessive-compulsive disorder.  Id. at 7.  She also wanted to rule out schizophrenia (paranoid type) and psychotic disorder NOS.  Id.  At intake, Mr. Hodge's GAF was 27.  Id.

The plan was for Mr. Hodge to be seen on an outpatient basis in therapy two or three times per week.  Id. at 7, 59.  A psychiatrist would also see Mr. Hodge in the next three to four weeks.  Id. at 7.

27

In accord with the plan, Mr. Hodge started to see a therapist, Jennifer West, on November 20, 2007.  Exhibit 10 at 57.  Ms. West saw Mr. Hodge multiple times each week between November 20, 2007 and February 28, 2008.  See exhibit 10, passim.

Also as part of the plan, Mr. Hodge saw a psychiatrist on December 7, 2007. Id. at 70.  Dr. Jones obtained a history that is basically in accord with the records summarized above.  Like Ms. Kieldgaard, Dr. Jones stated that Ms. Elson told Dr. Jones that Mr. Hodge "feels that if we say the name of his medication, he thinks the medication will become contaminated."  Id.  Apparently, Dr. Jones asked Mr. Hodge why there was a prolonged latency in answering questions and Mr. Hodge "admitted to 'doing rituals in my head.'"  Id. at 70.  Dr. Jones assigned Mr. Hodge a score of 41-50 on the GAF.  Id. at 69.  Dr. Jones prescribed various medications, although there was a disagreement among Dr. Jones, Mr. Hodge, and his mother about the best course of medication.  Exhibit 10 at 69-70.

Mr. Hodge continued to see Dr. Jones during December 2007.  Dr. Jones eventually increased the dose of Luvox to100 mg every morning and 50 mg at bedtime as treatment for the OCD and depressive symptoms.  Id.  at 67.  Dr. Jones also noted that Ms. Elson required "much education [regarding Mr. Hodge's] illness and treatment."  Id. at 68.  By the end of December, Dr. Jones stated that Mr. Hodge "[s]tates that he is for the most part great" and that "the rituals have decreased, the mood has improved and even the psychotic stuff has decreased."  Id. at 67.  Dr. Jones also noted that Mr. Hodge's mood was "better," he was well groomed, and had good eye contact.  Id.

In January 2008, Mr. Hodge seemed to be having trouble.  At the January 3, 2008 visit, Dr. Jones was unable to see Mr. Hodge and spoke only with Ms. Elson. Id. at 66.  Dr. Jones stated that Ms. Elson told Dr. Jones that Mr. Hodge "was doing okay on the SSRI, but then all of the sudden he just plummeted."  Id.  Ms. Elson reduced the dosage of Luvox to 25 mg per morning.  Id.  Ms. Elson spoke to Dr. Jones alone about concerns with program manager and left without bringing Mr. Hodge in to see Dr. Jones.  Id.  Ms. Elson later called stating she no longer wanted Mr. Hodge to receive care at the facility.  Dr. Jones expressed willingness to continue care and urged Ms. Elson to continue with medication and therapy.  Id.

28

Until January 25, 2008, Dr. Jones had noted compliance as "full." However, during this visit, he noted "MOTHER SELF-ADJUSTS all meds." Id. at 65. Dr. Jones states that Ms. Elson had discontinued Luvox "[n]ow OCD has gotten worse." Id. Dr. Jones discontinued Lithium due to Ms. Elson "self-adjusting this med which could be dangerous." Id. Dr. Jones stated that Mr. Hodge "cont[inues] to have depressive, psychotic and obsessive-compulsive [symptoms] in context of mother self-adjusting doses & starting/stopping meds on own." Id.

By February 2008, Dr. Jones was recommending that Mr. Hodge be admitted to an inpatient service at UCLA. See exhibit 10 at 22, 61, 64. On February 28, 2008, Ms. Elson, Ms. West, and senior people at Transitional Youth met to discuss "issues that have arisen between client's mother and staff at Transitions." Ms. Elson stated that she intended for her son to start treatment at UCLA next week. Exhibit 10 at 18. However, Ms. Elson informed Ms. West on April 23, 2008, that Mr. Hodge had not started at UCLA. Id. at 17.

Again, Dr. LaRusso translated Mr. Hodge's numeric GAF scores into words. The GAF of 27 from November 16, 2007 meant that "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas." Exhibit A at 2; accord exhibit C at 13. The GAF rating from Dr. Jones on December 7, 2007 meant that Mr. Hodge had "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Id. Dr. LaRusso commented that both "suggest significant impairment." Id.

However, Dr. LaRusso also noted that while in Transitional Youth, Mr. Hodge's "team had the capacity to determine [potentially missing word] even when his psychiatric symptoms caused impairment." Exhibit A at 2. Examples of Mr. Hodge displaying the ability to make decisions included signing forms consenting to treatment and permitting his mother to participate, attending and acting appropriately at a holiday party, and declining to being admitted to the hospital on February 15, 2008. Id. at 2-3.

Dr. Dunn's analysis was similar to Dr. LaRusso's analysis. Like Dr. LaRusso, Dr. Dunn began with the GAF score from November 16, 2007. Dr. Dunn, then, opined that treatment in the following year, which extended beyond

29

the services provided at Transitional Youth, "was effective and resulted in significant improvement." Exhibit C at 13.

### 7.   Miscellaneous Visits – March 2008 through February 2009

Mr. Hodge went to the emergency department on March 8, 2008, at West Hills Hospital & Medical Center because he felt faint while eating dinner. Exhibit 8 at 47. As part of the doctor's neurologic examination, the doctor recorded that Mr. Hodge "answers all my questions appropriately." Id. at 48. "He obeys my command appropriately." Id. The doctor believed the fainting was related to medications that Mr. Hodge was taking for his OCD. Id.

Although Dr. Dunn quoted from this report, he did not separately analyze it. See exhibit C at 21. Dr. LaRusso mentioned that during this visit, Mr. Hodge was asked to authorize a release of medical records from another facility. Exhibit A at 3.

In May 2008, Ms. Elson returned to Transitional Youth to discuss whether Mr. Hodge should continue to receive services. Exhibit 10 at 14-15. Mr. Hodge did meet with Ms. West four times in June. Id. at 9-10, 12-13. In the last session, Ms. West recorded that Mr. Hodge "resisted answering certain questions, reluctantly explaining that responding specifically about some things 'triggers' 'panic,' and that this is because it 'taints' or 'contaminates' certain places/things. [Mr. Hodge] has limited insight as to the nature and reality of these obsessions and delusions." Exhibit 10 at 9. This June 23, 2008 appointment was the last time that Ms. West saw Mr. Hodge. Id. at 8.

On December 4, 2008, Mr. Hodge again went to the emergency department at West Hill. Exhibit 8 at 1-26. He had a rash on his left thigh and a lesion on his left eyelid, neither of which required medical intervention. Id. at 26.

Dr. LaRusso noted that Mr. Hodge "was able to sign in to accept treatment and to decline an Advanced Directive." Exhibit A at 4. Dr. Dunn remarked that his overall care level was "1" meaning the person "typically has their full mental capacities." Exhibit C at 23, citing exhibit 8 at 13.

### 8.   Olive View - UCLA Medical Center – February 2009 and May 2009

Mr. Hodge went to a different emergency department, this time the one associated with Olive View - UCLA Medical Center, on February 13, 2009. Exhibit 14 at 372-78; exhibit 7 at 5-8, 213.  Mr. Hodge was complaining about headaches for one year and also seizure-like activity for six months.  Id. at 372. On this date, blood was drawn for laboratory tests.  Exhibit 7 at 213.  A note from the triage nurse states that Mr. Hodge was referred for an MRI.  Exhibit 14 at 376; see also exhibit 7 at 8 (indicating that Mr. Hodge's mother requested a neurology follow-up and an MRI).  Although the records are not entirely clear, it appears that Mr. Hodge was discharged with "ACI" (presumably, after care instructions) and referred to follow up with the next available appointment in the neurology clinic. Id. at 371.

However, it appears that an MRI was not performed in February 2009.  Ms. Elson's September 29, 2014 affidavit describes that MediCal – Medicaid refused to cover an MRI, although Ms. Elson is not specific about when the denial happened. Exhibit 19 at 2.

Eventually, Mr. Hodge underwent an MRI on May 18, 2009.  Exhibit 2.[18] The MRI was performed in the absence of any clinical history.  The interpreting doctor, Thu-Anh Hoang, detected multiple lesions in Mr. Hodge's brain.  Id. at 1. Dr. Hoang "suspect[ed] the presence of demyelinating disease, in the absence of adequate clinical history."  Id. at 2.[19]

---

[18] When Mr. Hodge had a repeat MRI done on August 11, 2009, the doctor compared the results to the May 18, 2009 MRI.  Exhibit 7 at 65.  The use of the May 18, 2009 MRI as a basis for comparison supports a finding that the May 18, 2009 MRI was the first MRI performed on Mr. Hodge.

[19] The version of the May 18, 2009 MRI that appears in exhibit 2 was printed on July 8, 2009, and states that Mr. Hodge was admitted on 02/14/09.  The report of the May 18, 2009 MRI also appears as pages 210-11 of exhibit 7.  The version in exhibit 7 was printed on July 2, 2010, and indicates Mr. Hodge was admitted on 06/17/10.

These records received little attention from Dr. Dunn and Dr. LaRusso.  See exhibit A at 4, exhibit C at 24.

### 9.    Filing the Petition – July 15, 2009

The May 18, 2009 MRI prompted the filing of the pending petition.  See Pet., filed July 15, 2009.  According to the petition, Ms. Elson received the results shortly before July 13, 2009.  Id. ¶¶ 7, 9.  Then, on July 13, 2009, Ms. Elson contacted Mr. Hodge's attorney, who submitted the petition two days later.  Id. ¶ 7.  The petition also asserts that until they received the results of the May 18, 2009 MRI, Mr. Hodge and Ms. Elson "had absolutely no reason to suspect that he has had a vaccine related injury."  Id. ¶ 9.

### 10.    Post-Petition Medical Records

After May 18, 2009, it appears that the next significant encounter with medical personnel occurred on August 1, 2009, when Mr. Hodge returned to the emergency department at Olive View.  Exhibit 14 at 369-70.[20]  Mr. Hodge was complaining of chest pain on his left side, which Mr. Hodge's mother reported he was experiencing on and off for two years.  Id. at 369.  The triage nurse also recorded that Mr. Hodge was seeing a "neurologist for headaches, dizziness, muscle aches, numbness to arms and [abnormal] MRI."  Id. (capitalization changed without notation).

Mr. Hodge went to the neurology clinic a few days later.  Exhibit 7 at 45-46.  The chief complaint was recorded as:

> 22 [year old] [male] referred for headaches from
> Midvalley – Dr. Munoz.  Pt. was normal prior to age of

---

[20] The Secretary asserted that Mr. Hodge was at Olive View on June 3, 2009.  Resp't's Rep. at 8, citing exhibit 7 at 81.  The problem is that although the laboratory studies presented on this page do say "Adm: 06/03/09," the reports also indicate that the blood was collected about one year later on 06/24/2010.  Id.

On the other hand, there is a negative test for antibodies for Borrelia burgdorferi, the causative agent for Lyme disease, that was drawn on June 18, 2009.  Id. at 204.  Other laboratory tests were conducted on blood drawn on July 23, 2009.  Id. at 194.

> 17, abrupt onset of OCD-like behavior (counting, checking, etc) over 1 month, then onset of a mental "fogginess" / "detachment from reality" of insidious onset that has since waxed and waned with periods of "normalcy." By the age 19, mother states he has never been back to baseline psych level always somewhat detached/ wierd [sic]. At age 18½ had routine hep B vaccine, then that night had stabbing spinal back pain [with] neg CT head. Age 19, pt [complained of] "arm/neck/back" muscle and skin "tightness" [with] spams of gradual onset (intermittent). Also has a numbness of mainly arm that is somewhat persistent but is intermittently exacerbated. + tick exposure in North Cal [with] neighbor [with] Lyme [disease]. Mother convinced [symptoms] [secondary to] hep vaccine.

Id. at 46.

The report also contains a summary of the results from a mental status examination. "Mr. Hodge was oriented to person, place, time, and situation. His mood was normal, but his affect was blunted. He had difficulty with serial 7's, and he displayed slight perseverations." Id. at 46. The author (probably Dr. Mishra) was aware of an MRI and testing for Lyme disease. The author ordered various tests including another MRI. Id.

Both Dr. Dunn and Dr. LaRusso included information from this appointment in their reports, but neither provided any opinion about Mr. Hodge's ability to function in early August 2009. See exhibit A at 4, exhibit C at 25.

A more significant record came from Dr. Dasher on October 22, 2009. The chief complaint included "'Fog in head, memory issues, joint pains throughout body' [for] 4-5 years" and "some new onset OCD [symptoms] – incredible urge to touch, count." Exhibit 14 at 441.

Dr. Dasher also completed a mental status exam. For most categories, Mr. Hodge was normal. His mood was anxious and angry, but he denied being depressed. His obsessions were touching and counting. He denied delusions and

auditory hallucinations.  There was a question about visual hallucinations.  Id. at 446.

Dr. Dasher determined that Mr. Hodge's GAF was currently 45 and 60 within the past year.  Dr. Dasher recommended neurocognitive / personality testing.  Id. at 447.

According to Dr. Dunn,[21] a GAF score of 60 does not indicate severe impairment or lack of capacity.  Dr. Dunn concludes that for approximately one year before Dr. Dasher's assessment, which was on October 22, 2009, Mr. Hodge was competent.  Exhibit C at 25.

In contrast, Dr. Dasher's report in this litigation indicates that when Dr. Dasher has been able to observe Mr. Hodge, Mr. Hodge has not been capable of handling his own affairs.  Exhibit 22 at 2 (point 3).  Dr. Dasher's October 22, 2009 report is the most recent contemporaneously created record that bears upon Mr. Hodge's capacity from 2006 to July 2009.

**11.   Evaluation**

The expert reports, which the parties did not submit until after the Court remanded the case, were very helpful in understanding Mr. Hodge's capacity.  Dr. Dasher's opinion is that Mr. Hodge was generally not capable of managing his affairs, at least in the time that Dr. Dasher was treating Mr. Hodge.  Exhibit 22. Dr. LaRusso opined that "Mr. Hodge suffered a period of significant psychiatric decompensation beginning on July 7, 2007. . . . There was some improvement in his condition with therapeutic treatment, and his records show he had a level of impairment but retained a level of capacity to make decisions."  Exhibit A at 6. Dr. Dunn concluded that just before July 10, 2007, "Mr. Hodge became severely impaired and lacked capacity.  This period of incompetency lasted for approximately one year, until the middle of 2008."  Exhibit C at 27.

The opinions of Dr. LaRusso and Dr. Dunn that Mr. Hodge lacked capacity for approximately one year is sufficient to find that Mr. Hodge is entitled to

---

[21] Dr. LaRusso did not address Dr. Dasher's GAF score of 60.

equitable tolling.  Thus, the undersigned refrains from making any factual findings regarding Mr. Hodge's capacity from April 2006, when he received the first vaccinations, through the end of June 2007, which is shortly before he was evaluated at West Valley.  The undersigned also refrains from making any factual findings regarding Mr. Hodge's capacity after September 2008, which corresponds to the approximate date at which Dr. Dasher scored Mr. Hodge's GAF as 60.

The determination that approximately one year of impaired capacity suffices to entitle Mr. Hodge to equitable tolling is based, in part, on the amount of time by which Mr. Hodge filed late.  Based upon Mr. Hodge's visit to Valley Presbyterian Hospital (exhibit 6 at 1-12), Dr. Tornatore opined that Mr. Hodge's mental condition was substantially worse on June 2, 2006.  Exhibit 18.  Thus, Mr. Hodge should have filed his petition by June 3, 2009.  42 U.S.C. § 300aa−16(a)(2).  He actually filed on July 15, 2009, which is 42 days later.

The parties largely overlooked the significance of the duration of impairment.  Mr. Hodge simply argued that he lacked capacity throughout the time from April 2006 through July 2009.  Pet'r's Br., filed Oct. 16, 2015, at 16. Consistent with her argument that equitable tolling for mental illness is not compatible with the Vaccine Act (see section I above), the Secretary stated that during this one-year period, an unappointed guardian could have filed a petition for Mr. Hodge.  Resp't's Br., filed Nov. 20, 2015, at 10 n.7.

Stronger guidance comes from the Federal Circuit's opinion in Checo v. Shinseki, 748 F.3d 1373 (Fed. Cir. 2014), a case that the Secretary cited.  There, Ms. Checo sought veterans' benefits.  However, on July 6, 2011, the Board of Veterans' Appeals denied her request.  On this date, Ms. Checo was homeless, and apparently remained homeless until September 27, 2011, when she communicated a new address to the Department of Veterans Affairs.  She received a copy of the Board's adverse decision on October 6, 2011, which was within the time permitted to file an appeal.  However, she did not file the appeal until December 7, 2011, 33 days later.  Checo, 748 F.3d at 1375.

The Federal Circuit accepted the parties' contention that the period of equitable tolling should be measured with a "'stop-clock' approach."  Id. at 1380. Under the stop-clock approach, "the clock measuring the 120-day appeal period is

'stopped' during the extraordinary circumstance period and starts ticking only when the period is over." Id. at 1379.

As a case arising from a claim for veterans benefits, Checo has different factual underpinnings than a case from the Vaccine Program. Nevertheless, Checo is a case from the Federal Circuit. Moreover, the reasoning of the "stop-clock approach" is persuasive.[22] Thus, the undersigned will also use the stop-clock approach to Mr. Hodge's case.[23]

Therefore, the essential chronology should be restated as follows:

On June 2, 2006, Mr. Hodge's claim accrued and the clock representing the 36-month statute of limitations started ticking.

By July 2007, approximately 13 months of time on the statute of limitations clock had expired and approximately 23 months of time remained. On July 10, 2007, this clock was stopped because Mr. Hodge was unable to manage his own affairs.

In September 2008, the statute of limitations clock began ticking again.

By July 2009, 10 more months had elapsed, but 13 months remained. Therefore, Mr. Hodge filed his petition within the time permitted by the statute of limitations as adjusted for equitable tolling.

---

[22] This approach is also consistent with 28 U.S.C. § 2501, stating that a petition may be filed within three years after the disability ends if the person was under legal disability at the time the claim accrued.

[23] An alternative approach would be to require people lacking mental capacity to manage their affairs to establish that the incapacity lasted the entire period covered by the statute of limitations. See Checo, 748 F.3d at 1379-80; MacLennan v. Provident Life & Acc. Ins. Co., 676 F. Supp. 2d 57, 63 (D. Conn. 2009). The Secretary has not made this argument and, therefore, it is not considered.

Consequently, Mr. Hodge's case will proceed to the merits of evaluating whether the hepatitis A and hepatitis B vaccinations caused him any harm.

## IV.   Issues Implicated by Mr. Hodge's Status as the Petitioner

Mr. Hodge's claim for equitable tolling based upon a lack of capacity differs from other claims for equitable tolling based upon an isolated problem.  Mojica, 102 Fed. Cl. 96, illustrates a more traditional example of equitable tolling.  There, the petitioners' attorney sent a petition through an overnight delivery service that lost the petition.  After an unusual series of procedural events (id. at 97-98), the Court of Federal Claims recognized that the petitioners' case qualified as an "extraordinary circumstance" for which equitable tolling was appropriate.  Id. at 101.  Significantly, after the case was allowed to proceed, the reason for the late filing and extraordinary circumstance justifying equitable tolling was no longer an issue.

Mr. Hodge's case is different in the sense that according to him, his mental illness has lasted throughout this case.[24]  This leads to two questions about Mr. Hodge's status as the petitioner when the case was originally filed and his continued ability to act as the petitioner.

As discussed earlier, the Vaccine Act identifies three people who qualify as petitioners.  42 U.S.C. § 300aa−11(b)(1)(A).  In filing his petition, Mr. Hodge appears to have represented himself as a "person who has sustained a vaccine-related injury," which is listed first.

Notably, Mr. Hodge did not take advantage of the statute's second category of people who qualify as petitioners:  "the legal representative of such person if such person is a minor or is disabled."  When the petition is brought by the legal representative of a disabled person, "the petition must also be accompanied by documents establishing the authority to file the petition in a representative capacity or a statement explaining when such documentation will be available."  Vaccine

---

[24] Mr. Hodge recognized that before receiving the vaccinations in 2006, he had been prescribed Adderall and diagnosed with obsessive compulsive disorder.  Pet'r's Mem., filed Oct. 16, 2015, at 15.  Mr. Hodge implies that before the vaccinations, he could function as Mr. Hodge asserts that "Following the second vaccination, he became incapable of rational thought."  Id.

Rule 2(c)(2)(C).  According to the Rules of the Court of Federal Claims, "an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."  Rule 17(c)(2) of the Rules of the Court of Federal Claims.

In advancing his claim for equitable tolling, Mr. Hodge seems to admit that he was disabled.  Mr. Hodge states he "was not capable of rational thought, deliberate decision [making], and unable to function in society when the petition was filed in July of 2009."  Pet'r's Mem., filed Oct. 16, 2015, at 15-16.  Petitioner further admits that this disability runs through the present day "render[ing] him incapable of rational thought, deliberate decision-making and unable to function in society."  Pet'r's Mem., filed Dec. 4, 2015, at 12.  The petitioner's characterization of himself as unable to function in society is consistent with Dr. Dasher's most recent report.  Exhibit 27.  Thus, it would appear that Mr. Hodge's petition should have been brought on his behalf by a next friend or guardian ad litem.

A remedy for this potential problem is found in RCFC 17.[25]  When an incompetent person does not have a representative (meaning a general guardian or conservator), a "court must appoint a guardian ad litem — or issue another appropriate order — to protect" the incompetent person.  RCFC 17(c)(2).  The Court of Federal Claims found that a special master's orders to the parents of an incompetent (but unrepresented) adult constituted "an appropriate order." Kennedy, 99 Fed. Cl. at 543.

Here, the undersigned proposes that Mr. Hodge should have a general guardian or conservator appointed for him through the California Probate Court.  The reasons for this proposal are several.  Mr. Hodge's claim for equitable tolling is premised on his lack of ability to manage his own affairs.  Thus, someone must watch out for him.  A potential choice in this litigation is to assume that Mr. Shoemaker, who represents Mr. Hodge as an attorney, is advancing Mr. Hodge's best interests.  However, the duties of an attorney differ from the duties of a

---

[25] Special masters in the Vaccine Program may use RCFC 17.  Kennedy v. Sec'y of Health & Human Servs., 99 Fed. Cl. 535, 542 (2011), subsequent decision aff'd, 485 F. App'x 435 (Fed. Cir. 2012).

guardian ad litem.  McCaslin v. Radcliff, 168 F.R.D. 249, 256 (D. Neb. 1996), aff'd without opinion, 141 F.3d 1169 (8th Cir. 1998).

In addition, although Kennedy states "the Special Master could have appointed the parents as 'next friends' or guardians ad litem," 99 Fed. Cl. at 542, the Federal Circuit has not confirmed the extent of a special master's authority. Special masters must heed the limits to their authority.  See Patton v. Sec'y of Health & Human Servs., 25 F.3d 1021, 1026 (Fed. Cir. 1994) ("the Office of Special Masters owes its existence to and derives its powers from the Vaccine Act").

This caution seems especially appropriate here because the California Probate Court is a tribunal whose duties include appointing guardians or conservators.  The California Probate Court, therefore, has extensive experience with determining who should act as an incompetent person's guardian or conservator.  The California Probate Court also has a system to oversee the performance of the guardian or conservator.  These features make the California Probate Court a better forum to determine who should act for Mr. Hodge.

Finally, the California Probate Court's appointment of an appropriate representative for Mr. Hodge may expedite resolution of this matter.  Assuming that the special master could and did appoint a next friend, the next friend probably could not receive the compensation.  See Neilson v. Colgate-Palmolive Co., 199 F.3d 642, 656 (2d Cir. 1999) (noting that after district court appointed a guardian ad litem, the district court did not have to delay approving a settlement for appointment of general guardian); Noe v. True, 507 F.2d 9, 12 (6th Cir. 1974) (describing duties of guardian ad litem).  In the Vaccine Program, the Secretary universally (or nearly universally) conditions payments to a minor's parents on the parents' status as guardians appointed by the local probate court.  See, e.g., Sucher v. Sec'y of Health & Human Servs., No. 07-58V, 2012 WL 1030028 (Fed. Cl. Spec. Mstr. March 2, 2012) (awarding cost for surety bond required for appointment of conservator); Stewart v. Sec'y of Health & Human Servs., No. 06-287V, 2011 WL 5330388 (Fed. Cl. Spec. Mstr. Oct. 17, 2011) (awarding compensation for establishing guardianship).

Thus, if Mr. Hodge succeeds in his goal of receiving compensation through the Vaccine Program, he will, in all likelihood, be required to have a general

guardian or conservator appointed for him.[26]  Under these circumstances, involving the California Probate Court earlier, rather than later, may be a more efficient path.

Both parties ARE ORDERED to file briefs addressing the advisability of an order requiring Mr. Hodge to request an appropriate action by the California Probate Court.  Needless to say, Mr. Shoemaker should present the views of his client, Mr. Hodge, which may (or may not) align with the views of his mother. The parties shall file supplemental briefs on this issue in **30 days**.

## Conclusion

As developed on remand, Mr. Hodge's argument for equitable tolling presents several complicated legal issues.  These include:

1. Whether the Vaccine Act permits equitable tolling for mental disability or does the Vaccine Act's provision that a legal representative of a disabled person may file a petition preclude the use of equitable tolling for disability?
2. Must petitioners who are claiming equitable tolling for mental disability establish diligence in pursuing their legal rights to file a claim?
3. For claims of mental disability, must petitioners establish that the disability impaired their functioning for the entire period covered by the statute of limitations?

These are questions of law for which there is little (or no) appellate guidance.  As the case law around equitable tolling develops, the conclusions reached in this decision may need to be revisited.

In addition to these challenging issues of law, Mr. Hodge's case involves questions of fact.  The primary factual determination is that Mr. Hodge was not capable of managing his affairs from July 2007 through September 2008.  Pursuant

---

[26] Due to the issues involving the statute of limitations and equitable tolling, the parties have not presented any expert reports addressing whether the hepatitis vaccinations in 2006 harmed Mr. Hodge in some way.  Thus, this ruling should not be interpreted as providing any guidance as to whether Mr. Hodge will be found entitled to compensation.

to a "stop-clock" approach to equitable tolling, this period of disability is sufficient to find that Mr. Hodge is entitled to equitable tolling.

Finally, because Mr. Hodge has stated that he is disabled, the California Probate Court may wish to appoint a guardian for him.  The parties are instructed to file briefs within 30 days on this topic.

This ruling is intended to answer the Court's remand.  As such, the Clerk's Office is instructed to transmit it to the presiding judge.  <u>See</u> Vaccine Rule 28.1(a).  However, this ruling does not constitute a "decision" as that term of art is used in the Vaccine Program.  <u>See</u> <u>Currie v. Sec'y of Health & Human Servs.</u>, No. 02-838V, 2003 WL 23218074 (Fed. Cl. Spec. Mstr. Nov. 26, 2003).

**IT IS SO ORDERED.**

<u>s/ Christian J. Moran</u>
Christian J. Moran
Special Master