# In the United States Court of Federal Claims

No. 09-453V
(Filed Under Seal: March 7, 2023)
(Reissued for Publication: March 22, 2023)[1]

```
*****************************************
JEREMY HODGE, by his conservator         *
ERIKA ELSON,                             *
                                         *
                Petitioner,              *   Vaccine Act; Motion for Review;
                                         *   Consideration of the Record as a Whole;
v.                                       *   Failure to Evaluate Relevant, Reliable
                                         *   Evidence; Factual Predicate for Petitioner's
SECRETARY OF HEALTH AND HUMAN            *   Theory of Causation; Remand
SERVICES,                                *
                                         *
                Respondent.              *
*****************************************
```

Renée J. Gentry, Washington, DC, for petitioner.

Bridget A. Corridon and Althea Walker Davis, United States Department of Justice, Washington, DC, for respondent.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

      Petitioner Erika Elson filed an amended petition under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 to -34, alleging that her son's neurological issues were significantly aggravated by his hepatitis A and hepatitis B vaccinations. The special master determined that petitioner did not establish a necessary factual predicate for her theory of causation and therefore failed to prove that she was entitled to compensation. Petitioner seeks review of that decision, arguing that the special master did not consider the record as a whole as required by the Vaccine Act.  As explained in more detail below, the court grants petitioner's motion for review, sets aside certain fact findings and legal conclusions made by the special master, makes its own findings of fact, and remands the case to the special master to reevaluate petitioner's entitlement to compensation.

---

[1] Vaccine Rule 18(b), included in Appendix B of the Rules of the United States Court of Federal Claims, affords each party fourteen days in which to object to the disclosure of (1) trade secrets or commercial or financial information that is privileged or confidential or (2) medical information that would constitute "a clearly unwarranted invasion of privacy."  Neither party objected to the public disclosure of any information included in this opinion.

# I.  BACKGROUND

## A.  Procedural History

Jeremy Hodge, in his individual capacity, filed a petition for compensation under the Vaccine Act on July 15, 2009, alleging unspecified injuries arising from his hepatitis A and hepatitis B vaccinations.[2]  Over the following few years, Mr. Hodge filed various medical records in support of his claim.  After he indicated that all of his medical records had been filed, respondent moved to dismiss the petition on the ground that it was filed beyond the applicable limitations period.  Thereafter, Mr. Hodge filed additional medical records and an expert report from Carlo Tornatore, M.D. that addressed his diagnosis and the onset of his symptoms.  The parties then briefed the issue of whether equitable tolling applied in this case due to Mr. Hodge's mental health issues, and Mr. Hodge submitted an affidavit from his mother.  On March 23, 2015, the special master dismissed the petition as untimely.  Mr. Hodge filed a motion for review, which the undersigned granted on September 9, 2015.  The case was remanded to the special master with instructions to reevaluate Mr. Hodge's equitable tolling argument based on the entirety of the record and then issue a new decision on respondent's motion to dismiss.

During the remand period, Mr. Hodge filed additional medical records, two expert reports from Robert Dasher, M.D., and two affidavits from his mother, while respondent filed expert reports from Elizabeth M. LaRusso, M.D., and John T. Dunn, Ph.D.  On December 21, 2015, the special master issued a decision in which he concluded that the statute of limitations should be equitably tolled and directed the parties to address whether a guardian should be appointed on behalf of Mr. Hodge.  The following year, Mr. Hodge's mother was appointed his conservator, and in that capacity she was substituted as the petitioner in this case.

On March 6, 2017, after filing additional medical records and another expert report from Dr. Tornatore, petitioner filed an amended petition to specify her son's injury:  a significant aggravation of his preexisting neuroborreliosis.  Thereafter, respondent filed an expert report from Arun Venkatesan, M.D., Ph.D., and petitioner filed two additional expert reports from Dr. Tornatore.  The parties also filed prehearing briefs in anticipation of an entitlement hearing.

After receiving the prehearing briefs, the special master issued an order on September 13, 2018, in which he directed petitioner to obtain and file additional medical records from providers mentioned in the existing medical records and propounded a twelve-page, single-spaced list of questions for petitioner to answer in writing.  Four days later, the special master issued another order directing petitioner to obtain and file her social security file and eleven other sets of records (school records, medical records, and youth sports records).  Petitioner filed the records

---

[2]  The court limits its recitation of the case's procedural history and recounting of the contents of the medical records, school records, affidavits, and expert reports to the information relevant to the resolution of petitioner's motion for review.  A fuller account of the case's factual and procedural history can be found in the special master's decision.  See generally Hodge v. Sec'y of HHS, No. 09-453V, 2022 WL 4954672, at *2-9, *12-32 (Fed. Cl. Spec. Mstr. Sept. 12, 2022).

she was able to obtain and, on November 26, 2018, another affidavit.  The special master, dissatisfied with petitioner's production (of both the requested records and the contents of the affidavit), issued an order on November 28, 2018, in which he cancelled the upcoming entitlement hearing, indicated his intent to instead hold a fact hearing focused on Mr. Hodge's condition before and after his hepatitis A and hepatitis B vaccinations, stated that such a hearing would not be scheduled until the identified records had been produced, directed petitioner's counsel to seek authorization to issue subpoenas to obtain these records, further directed petitioner's counsel to be prepared to submit an affidavit describing the efforts made to obtain these records, explained that updated expert reports reflecting any new information would likely be necessary, and indicated that a new entitlement hearing would then need to be scheduled.  The special master acknowledged that the delay his requests would cause was contrary to the efficient resolution of claims contemplated by Congress in enacting the Vaccine Act, but stated his belief that such a delay was better than deciding the case without relevant factual information.

Eventually, on August 16, 2020, petitioner filed a statement indicating that all of the records requested by the special master, to the extent they existed, had been filed.  Thereafter, she filed another expert report from Dr. Tornatore and respondent filed another expert report from Dr. Venkatesan.  Petitioner subsequently advised the special master that she did not want to testify during the yet-to-be-scheduled entitlement hearing,[3] and instead proposed filing another affidavit, which she did on February 3, 2021.  In this affidavit, she directly answered the questions originally propounded by the special master in September 2018.

In a March 25, 2021 order, the special master indicated that he was inclined to order petitioner to testify during the entitlement hearing.  In response, petitioner again indicated her objections to testifying, but stated that she would make herself available if required by the special master.  The special master treated the latter statement as petitioner indicating her willingness to testify and thus incorporated petitioner's testimony into the hearing schedule, along with the testimony of Dr. Tornatore and Dr. Venkatesan.

The special master held the entitlement hearing on June 14-15, 2021.  The parties then filed posthearing briefs from September 2021 to February 2022, and the special master heard argument in March 2022.  Six months later, on September 12, 2022, the special master issued his decision.

At the outset of his decision, the special master summarized petitioner's theory of causation:

> [Petitioner] alleges that (1) her son, Jeremy Hodge, developed Lyme disease in 2003; (2) the untreated bacterial infection progressed to a central nervous system disorder known as neuroborreliosis; (3) the Lyme disease / neuroborreliosis in turn caused him to develop obsessive-compulsive disorder ("OCD"); (4) then, the 2006 hepatitis B vaccine(s) significantly aggravated his condition.

---

[3] By this point in time, the special master's plan to conduct separate fact and expert hearings had been abandoned.

Hodge, 2022 WL 4954672, at *1.  He then identified three issues presented by this case:  (1) "the absence of records during the critical periods of time"; (2) the inconsistency of petitioner's testimony, provided "many years after the subject events took place," that was meant to "fill in the evidentiary gaps"; and (3) the experts' "develop[ment of] their opinions based upon the rough sketch that the limited record evidence provides." Id. at *1-2.  With respect to second issue, the special master found that petitioner's testimony, "[a]t times," was contradicted by the medical records, inconsistent, and hyperbolic. Id. at *33.  He therefore found petitioner's testimony unreliable, and held that it could not form the basis for any finding of fact.  With respect to the third issue, he remarked that Dr. Tornatore's opinion was premised on Mr. Hodge suffering from Lyme disease before he developed OCD, but that petitioner had "not established that predicate with preponderant evidence." Id. at *2.  He therefore held that petitioner did not establish her entitlement to compensation.

The special master's decision contains a lengthy recounting of much of the factual evidence in the record, including Mr. Hodge's medical and school records, petitioner's affidavits, the reports of petitioner's experts, and the oral testimony elicited from petitioner and Dr. Tornatore during the entitlement hearing.[4]  The court briefly summarizes the evidence relevant to the resolution of petitioner's motion for review.[5]

### B. Information Included in Mr. Hodge's Medical Records

Mr. Hodge was born on May 15, 1987.  His pediatric records reflect a number of normal childhood illnesses and injuries through July 8, 1996, when he was nine years old.  There are no medical records from that date until March 10, 2004, when he visited his pediatrician with a two-month history of sinus pressure.

Mr. Hodge's mental health issues are first referenced in a September 28, 2004 notation by an individual in his pediatrician's office describing petitioner's report that a psychiatrist had given Mr. Hodge a prescription for Adderall.  This notation is supported by pharmacy records

---

[4]  The special master's recounting omits discussion of certain records, which the court addresses below.  It also includes a few inaccuracies.  For example, the special master erroneously indicated that Mr. Hodge was in the ninth grade from 2003 to 2004 and was sixteen-to-seventeen years old at the time. Compare Hodge, 2022 WL 4954672, at *14 ("In ninth grade (2003-2004), Mr. Hodge again attended the City of Angels School. . . .  Mr. Hodge would have been 16-17 years old during ninth grade."), with Pet'r's Ex. 61 at 6-7 (reflecting that Mr. Hodge's ninth grade year began in October 2002, and that his first two (of six) semesters in senior high school ended in January 2004 and June 2004, respectively).  As another example, the special master implies that Shri Mishra, M.D. recorded Mr. Hodge's chief complaint, history of present illness, and assessment during an August 4, 2019 visit, even though the medical record reflects that this information was recorded by another physician. Compare Hodge, 2022 WL 4954672, at *24, with Pet'r's Ex. 7 at 45-46.  Further inaccuracies are noted later in this decision.

[5]  The court derives its summary from the special master's decision and petitioner's affidavits.  Additional details from the medical records are set forth in the court's discussion of petitioner's motion for review.

indicating that John Nasse, M.D. prescribed Adderall for Mr. Hodge that same day (Dr. Nasse also prescribed Risperdal for Mr. Hodge the previous day).[6]  A March 21, 2005 pediatric record indicates that Mr. Hodge had been taking Zoloft, and medical records from the spring of 2006 indicate that the Zoloft was being used to treat OCD, which Mr. Hodge developed when he was seventeen years old.

On March 17, 2006, when he was eighteen years old, Mr. Hodge received a hepatitis A vaccination and his first hepatitis B vaccination.  Mr. Hodge received his second hepatitis B vaccination on April 25, 2006.  On June 2, 2006, he was evaluated at the Valley Presbyterian Hospital emergency room for balance issues, dizziness, eye movement disturbances, fatigue, and pain.  His discharge diagnoses were dizziness and arthralgias-myalgias following the hepatitis vaccination.  Six days later, at petitioner's request, one of Mr. Hodge's physicians agreed to request an MRI for Mr. Hodge.  However, Mr. Hodge did not obtain an MRI at that time.  In fact, Mr. Hodge did not obtain an MRI until May 19, 2009.  The MRI revealed white matter hyperintensities in Mr. Hodge's brain, leading a neurologist to suggest the possibility of a demyelinating disease, among other potential diagnoses.  A blood test on June 5, 2009, revealed the presence of antibodies for Borrelia burgdorferi, suggestive of Lyme disease, but subsequent testing for those antibodies had negative or inconclusive results.

The record from a neurology examination on August 4, 2009, includes the first mention of a tick exposure in the section describing the history of Mr. Hodge's illness.  That record further indicates that Mr. Hodge had psychiatric disorders, including OCD, of various onsets starting at age seventeen, and that the onset of his OCD-like behavior occurred abruptly over the course of one month.  On December 11, 2009, an infectious disease specialist indicated that Mr. Hodge's symptoms were consistent with chronic neuroborreliosis.

### C.  Petitioner's Written and Oral Testimony

Petitioner submitted several affidavits to expand upon the information described in the medical records and fill in gaps where no relevant records exist.  In her first affidavit, filed on January 14, 2011, petitioner stated that Mr. Hodge "was at all times before his vaccination, extremely healthy.  He was kind, happy-go-lucky, and excelled in athletics." Pet'r's Ex. 9 ¶ 6. She reported, however, that Mr. Hodge began to suffer from allergy-like symptoms at age sixteen, leading them to seek medical treatment.  Petitioner stated that the physician who examined Mr. Hodge on March 17, 2006, Jorge Rodriguez, M.D., noted that Mr. Hodge had not yet received his hepatitis A and hepatitis B vaccinations, and had them administered that day. She then recounted:

---

[6]  Petitioner submitted a handwritten note, dated November 24, 2018, from Dr. Nasse in which Dr. Nasse explained that his records had been destroyed in a fire a couple of years before the records request.  Nevertheless, he certified that Mr. Hodge was his patient on-and-off for a year between 2000 and 2003, and was being treated for OCD.  The conflict between this certification and the September 2004 prescriptions he wrote for Mr. Hodge is not explained.

14.   The same evening he became violently ill with chills followed by hot flashes and stabbing pains that felt like electric shocks up his spine, his legs, and his arms.

15.   We thought he had caught the flu.

16.   He was somewhat better the following day, yet still felt hot.

17.   Days [passed] and he still felt tired, but his symptoms did not seem too alarming.

18.   On April 25, 2006, I took Jeremy back to Dr. Rodriguez for a Hepatitis B booster vaccination.

19.   After that vaccination, my son's health declined rapidly.

20.   He complained of horrible fatigue, numbness in his arms, and stiffness throughout his body.  He was unable to concentrate for any length of time.  He left school and has not returned to his studies.

Id. ¶¶ 14-20.  Petitioner did not mention OCD or describe any ritualized behaviors in this affidavit, nor did she mention Mr. Hodge's Lyme disease diagnosis.[7]

Petitioner's second affidavit, filed on October 1, 2014, provides additional detail regarding Mr. Hodge's health prior to the vaccinations at issue:

While we do not know the exact trip where Jeremy likely contracted Lyme disease, we would go camping all the time at Big Sur, near my grandparents' house.  There were always ticks on the pets, and there were a lot of deer and there were ticks on everything.  On our last trip there was a large amount of ticks everywhere.  In the sleeping bags and on the dogs.  At the end of that trip Jeremy had a bulls-eye rash on his leg.

Back then there was not much information about Lyme disease so we just treated it topically.  He had some flu-like symptoms but we never thought much of it.  Within a year of that he began exhibiting OCD hoarder symptoms and complained of spaciness and fogginess in his brain.

However before the hepatitis b vaccination in March of 2006 Jeremy was a young man getting ready to finish school and start his new life.  He loved going to wrestling events with his family.  Before the vaccine he would play video

---

[7]   Presumably, these topics were not addressed because the theory of causation at that time was that Mr. Hodge developed a demyelinating disease from his hepatitis A and hepatitis B vaccinations.  See, e.g., Pet'r's Ex. 9 ¶¶ 25-27 (stating that an MRI revealed lesions on Mr. Hodge's brain that indicated "a yet undiagnosed demyelinating condition").

games with friends.  He loved hiking, riding bikes, swimming.  He was very active.  He could drive and go out with friends.

Pet'r's Ex. 19 at 1.  She also expanded upon Mr. Hodge's condition postvaccination:

> After the March 2006 shot . . . it was night and day.  It was like he got hit by a bus.  He got very very ill within the month after the shot.  He deteriorated rapidly.  He went to the emergency room within a week.  He had severe pain shooting up and down his spine.  He was screaming in pain.  His eyes were jittery and moving all over the place.  That didn't stop for the next year.  He had to drop out of school – his independent study program.

Id.; see also Pet'r's Ex. 71 ¶ 19 (explaining that she erroneously attributed Mr. Hodge's deterioration in health to a single vaccination rather than the multiple vaccinations he received on two dates).  She expanded on this information in a third affidavit, filed on October 16, 2015:

> Jeremy's OCD developed around age 16.  Before about May 2006, my son acted on his OCD symptoms but he could participate in his life.  In the years before and leading up to his 2006 vaccination he played video games, skateboarded, wrestled.  He did engage in rituals but they didn't consume his entire life like they did for the next seven or eight years following the vaccine.

> . . . .

> Toward the end of 2005 Jeremy was on track to get his GED.  At that time, he could not attend school with the rest of his peers.  He took classes through an independent study program.  His OCD made him fall too far behind in school to keep up with ordinary classes.  Because of his condition, ordinary high school overwhelmed him.  His rituals, obsessions, and compulsions became so severe during the summer of 2006 that attending any classes whatsoever was a pipe dream.

Pet'r's Ex. 21 at 1; see also Pet'r's Ex. 71 ¶ 19 (explaining that she erroneously stated that Mr. Hodge wrestled; rather, he liked to attend WWE wrestling events).

Petitioner's fifth affidavit was submitted in response to the special master's order propounding a list of questions for her to answer.[8]  Petitioner did not directly answer the questions posed by the special master, but did address some of the questions' subject matter, such as Mr. Hodge's educational history.  After recounting Mr. Hodge's educational history through the ninth grade, she stated:

> 7.  I don't remember when Jeremy had the tick bite that resulted in the bulls-eye rash on his leg, but I think it was shortly before we moved to De Soto Avenue [on

---

[8]  The contents of petitioner's fourth affidavit are not relevant to the issues now before the court.

April 30, 2003].  It was some time after the move when he started having OCD symptoms.

8.  I took Jeremy to Valley Care on Victory Boulevard, and they prescribed medication for him to take.  First they tried Prozac, and then they switched to Zoloft.  Jeremy saw them off and on for about six months.

9.  While Jeremy had OCD symptoms, they did not interfere with his daily life. He continued to do well in school, and he continued to enjoy hiking, riding bikes, swimming, going to WWE wrestling events, shows, and even opera.  He also enjoyed playing video games with friends.

10.  Jeremy attended City of Angels for tenth grade.  His report card for tenth grade shows that he received all A's the first semester (which ended January 30, 2004), and he received 4 A's and one B the second semester (which ended June of 2004[)].  . . .  Clearly, Jeremy's OCD was not causing any problems with his school work.

Pet'r's Ex. 71 ¶¶ 7-10; see also id. ¶¶ 12-13 (indicating that Mr. Hodge did independent study through his school district for eleventh grade, that after the eleventh grade he dropped out of school to pursue his GED, and that he wanted to attend a local community college).  She also described Mr. Hodge's condition on the date of his hepatitis A and first hepatitis B vaccinations:

On March 17, 2006, I took Jeremy to the Noble Community Medical Center.  It is important to understand what Jeremy was like on that day.  He did have OCD, and he was somewhat depressed, but he was active and enjoying all of the activities described in paragraph 9 above.  The best analogy I can come up with is watching the TV series about Monk.  He has OCD, but it does not prevent him from living his life.  That was Jeremy.  He had a life.

Id. ¶ 14.  Petitioner directly responded to the questions posed by the special master in her sixth affidavit, and her answers to the questions relevant to her motion for review were consistent with the contents of her fifth affidavit.

In addition to providing extensive written testimony, petitioner testified during the entitlement hearing in June 2021.  The special master summarized petitioner's testimony regarding Mr. Hodge's prevaccination condition, placing particular emphasis on her inability to remember certain details regarding events that occurred more than fifteen years previously:

When asked to described Mr. Hodge's general health from birth to age 16, she stated he was "very healthy."  She testified that during a camping trip with lots of ticks, Mr. Hodge received a bull's-eye rash and subsequently developed OCD symptoms.  She recalled the OCD symptoms started at around age 16 and he received an OCD diagnosis at age 17.  Despite the symptoms, she insisted his life was "very normal."  However, he had to quit school in eleventh grade because Ms. Elson and Mr. Hodge had moved several times and "the OCD made him

work a little bit slower because he would get caught up counting" and with "ritualistic behavior."

. . . . On a bad day, Mr. Hodge would spend about 20% of his day consumed by OCD symptoms. On good days, it was not noticeable. She recalled Mr. Hodge getting OCD treatment at Valley Care, but could not remember the name of the doctor that diagnosed him. She stated he was on Prozac during this time period. . . .

During cross-examination, Ms. Elson was asked about whether Mr. Hodge was seeing other doctors or receiving other treatment at around age 16 when the OCD symptoms purportedly started. Ms. Elson responded: "It's kind of hard to remember. Everything is so – just such a blur now. I may have, about that time, gone to Dr. Nasse, but other than that, I'm sorry, I don't remember." She could not recall, without checking her notes, what grade Mr. Hodge was in when she separated from her husband. "The dates are very fuzzy for me right now. It's just been so long."

After being reminded that Mr. Hodge was placed on Adderall in 2004, Ms. Elson noted that Mr. Hodge took Adderall only one time. She stated she did not fill the prescription. She could not remember if Dr. Nasse prescribed any other medication, and thought Mr. Hodge saw him only twice. She recalled Mr. Hodge taking Zoloft for a couple of weeks in 2005. But, it was "hard to remember all the medications."

Respondent's counsel asked Ms. Elson if she had any recollection of the month or year that the Big Sur camping trip took place. She responded: "I know it was not – I know it wasn't – maybe spring. I'm literally guessing. . . . It would have been like summer or spring, something like that." She proceeded to say Mr. Hodge was about 14 or 15 years old on that trip (which would be between 2001 and 2002).[9]

Hodge, 2022 WL 4954672, at *18 (footnote added) (citations omitted). The special master then summarized petitioner's testimony regarding Mr. Hodge's postvaccination condition:

Ms. Elson testified that after the first shot, Mr. Hodge's eyes started fluttering and he complained of spinal pain and itching. Though the two allegedly told Dr. Rodriguez about the eye fluttering, it was not reflected in the medical record.[10] Then, "[a]ll hell broke loose" after the second hepatitis vaccine. She

---

[9] Mr. Hodge's fifteenth birthday was on May 15, 2002, and therefore he also would have been fifteen years old in 2003.

[10] Contrary to the special master's assertion, Dr. Rodriguez's "subjective" notes from Mr. Hodge's April 25, 2006 visit provide: "Pt gets itchy after [illegible], pt gets uncontrollable eye movements[.] Pt also complaining of back pain[.]" Pet'r's Ex. 5 at 3.

testified she requested an MRI "[e]very time" they went to an emergency room, but was denied until 2009 because they had Medi-Cal / Medicaid.

She testified his eye fluttering got worse after the second vaccine and he experienced horrible pain, weakness, and dizziness.  Similarly, she alleged his personality changed and his ritualistic behavior became constant.  She stated she reported all of these symptoms when she took him to the hospitals.  On cross-examination, she professed to not recalling several details.

Id. at *31-32 (footnote added).

Having set forth the background relevant to petitioner's motion for review, the court is prepared to address the merits of that motion.

## II.  DISCUSSION

### A.  Standard of Review

The United States Court of Federal Claims ("Court of Federal Claims") has jurisdiction to review the record of the proceedings before a special master, and upon such review, may:

(A)  uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B)  set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C)  remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2).  The standards set forth in § 300aa-12(e)(2)(B) "vary in application as well as degree of deference. . . .  Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard."  Munn v. Sec'y of HHS, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).  In this case, petitioner's sole enumerated objection to the special master's decision is that the special master improperly raised her burden of proof by separately assessing and rejecting each piece of evidence under the preponderance-of-evidence standard rather than evaluating all of the evidence in the record as a whole.  This approach, she argues, is not in accordance with law.  When faced with such a contention, the Court of Federal Claims reviews the special master's application of the law de novo.  Rodriguez v. Sec'y of HHS, 632 F.3d 1381, 1384 (Fed. Cir. 2011).

## B.  The Special Master Did Not Consider All of the Evidence in the Record

Petitioner, in support of her contention that the special master did not consider the record as a whole when determining that she had not established by a preponderance of evidence that Mr. Hodge's Lyme disease predated his development of OCD, maintains:

> In his analysis, the Special Master reviews the pieces of circumstantial evidence regarding the Big Sur camping trip individually, relying substantially on [petitioner's] six affidavits (including the final affidavit addressing 13 pages of questions from the special master issued several years after the fact) filed over the period of more than a decade, as well as her testimony at hearing in 2021 – nearly two decades after the events in question.  The Special Master then critiques every variation in [petitioner's] affidavits and testimony with respect to when the camping trip at Big Sur occurred.  He further criticizes and dismisses every medical record that references the tick-bite exposure trip as being insufficient.  He does both without acknowledging that [petitioner's] statements in her affidavits and testimony consistently report the tick-bite exposure camping trip occur[ing] before her son's diagnosis of OCD and prior to the first Hepatitis b vaccination and that the medical records at the time support this statement.  Nevertheless, he dismisses each one individually as lacking persuasive information.

Pet'r's Mot. 15 (footnotes and citations omitted).  Respondent counters that the special master appropriately considered all of the evidence in the record in concluding that petitioner had not established that Mr. Hodge suffered from Lyme disease in 2003, before he developed OCD and before he was vaccinated against hepatitis A and hepatitis B.

Under the Vaccine Act, a petitioner is entitled to compensation "if the special master . . . finds on the record as a whole . . . that the petitioner has demonstrated by a preponderance of the evidence" the necessary elements of a vaccine-caused "illness, disability, injury, condition, or death,"[11] and if there is not a preponderance of evidence that the "illness, disability, injury, condition, or death" is due to factors unrelated to the administration of the vaccine.  42 U.S.C. § 300aa-13(a)(1).  Further, when determining the weight to be given any "diagnosis, conclusion, judgment, test report, report, or summary" set forth in the medical records, the special master "shall consider the entire record and the course of the injury, disability, illness, or condition . . . ."  Id. § 300aa-13(b)(1).  This "statutory instruction to consider the entire record[] is consistent with the purpose of the Vaccine Act, which established 'a no-fault compensation

---

[11]  The necessary elements include:  (1) that the vaccine in question is set forth in the Vaccine Injury Table ("Table"); (2) that the vaccine was received in the United States or in its trust territories; (3) that the injured person either sustained an injury as a result of the administration of a Table-designated vaccine for a period of more than six months after the administration of the vaccine, suffered illness, disability, injury, or condition from the vaccine that resulted in inpatient hospitalization and surgical intervention, or died from the administration of the vaccine; and (4) that the petitioner has not previously collected an award or settlement of a civil action for damages arising from the alleged vaccine-related injury or death. 42 U.S.C. § 300aa-11(c)(1).

program "designed to work faster and with greater ease than the civil tort system.""" Moriarty v. Sec'y of HHS, 844 F.3d 1322, 1331-32 (Fed. Cir. 2016) (quoting Bruesewitz v. Wyeth LLC, 562 U.S. 223, 228 (2011)).

Precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") provides guidance on what is necessary to satisfy the requirements of 42 U.S.C. § 300aa-13(a)(1) and 42 U.S.C. § 300aa-13(b)(1). For example, in Golub v. Secretary of Health & Human Services, the Federal Circuit criticized the special master for "treat[ing] each element of the evidence individually, discrediting each piece of evidence in turn, without considering the totality of the evidence." 243 F.3d 561 (Fed. Cir. 2000) (unpublished table decision). It relied, in part, on its earlier decision in Jay v. Secretary of the Department of Health & Human Services, in which it held that the special master, in concluding that the petitioners had not established that their child suffered from an encephalopathy, "los[t] sight of the forest for the trees" because the testimony of the petitioners' expert reflected that the child, after his vaccination, exhibited symptoms consistent with an encephalopathy and then "died well-within the [Vaccine Act's] time frame for an encephalopathy." 998 F.2d 979, 983-84 (Fed. Cir. 1993).

Ten years later, in Cedillo v. Secretary of Health & Human Services, the Federal Circuit approved the special master's separate evaluation of each piece of evidence, remarking: "In the Special Master's careful and thorough opinion, he considered, weighed, and stated his reasons for rejecting or discounting each item of evidence in which the petitioners relied." 617 F.3d 1328, 1345 (Fed. Cir. 2010). In Snyder v. Secretary of Health & Human Services, it concluded that the special master properly "examin[ed] the record in its entirety" when he found that the respondent's evidence showed that the children's seizure disorders were caused by a factor unrelated to the DTaP vaccine, observing that the special master "did the analysis necessary to decide the Secretary had the stronger case based on testimony and the intellectual strength of the evidence, as well as the arguments presented." 553 F. App'x 994, 1000, 1003 (Fed. Cir. 2014) (unpublished decision). And most recently, in Paluck v. Secretary of Health & Human Services, the Federal Circuit held that "the special master failed in his duty to consider 'the record as a whole'" by "placing undue emphasis on the relatively insignificant variations" in some of a particular provider's records, thereby "giv[ing] short shrift to the evidence" of the child's condition reflected in the entirety of that provider's records. 786 F.3d 1373, 1382-83 (Fed. Cir. 2015). What all of this case law indicates is that a special master must not focus on individual pieces of evidence at the expense of determining what is depicted by the record as a whole, and that to the extent that a special master evaluates each piece of evidence on its own merits, he or she should ensure that all relevant evidence is so evaluated.

In setting forth his findings of fact, the special master in this case accepted the "undisputed" proposition "that Mr. Hodge had Lyme disease in December of 2009," but declined to find that Mr. Hodge had Lyme disease prior to that date, explaining:

> [A] finding that Mr. Hodge suffered from Lyme disease in 2009 does not mean that Mr. Hodge suffered from Lyme disease six years earlier in 2003. The medical records discussing Lyme disease start in 2009. The only evidence supporting a Lyme disease diagnosis prior to 2006 is derived from statements made by [petitioner]. Although Dr. Tornatore assumes Mr. Hodge had Lyme

-12-

> disease in 2003, the basis for that assumption comes from [petitioner's]
> testimony.  It is not wholly implausible that Mr. Hodge had Lyme disease before
> 2006.  But, in light of the above findings [that petitioner's testimony was
> unreliable because petitioner "made numerous statements that are in conflict with
> the medical records and that are contradicted by her own testimony,"[12]] the
> undersigned cannot credit that assertion because it is not sufficiently persuasive.

Hodge, 2022 WL 4954672, at *36; accord id. at *35 ("Given the finding that [petitioner] is not reliable . . . , the undersigned cannot accept the assertion that Mr. Hodge was bitten by ticks during a camping trip in 2003 or that he developed Lyme disease in 2003."), *37 n.50 ("While the evidence supports a finding that Mr. Hodge suffered Lyme disease in 2009, there is not preponderan[t] evidence that Mr. Hodge suffered Lyme disease in 2006.").  In other words, because the special master found "numerous" "flaws" in petitioner's testimony, id. at *34, he refused to credit any of her statements.

It is axiomatic that special masters have great discretion in assessing the credibility of witnesses and determining what weight their testimony should be afforded.  See, e.g., Andreu v. Sec'y of HHS, 569 F.3d 1367, 1379 (Fed. Cir. 2009); Pafford v. Sec'y of HHS, 451 F.3d 1352, 1359 (Fed. Cir. 2006); Lampe v. Sec'y of HHS, 219 F.3d 1357, 1360 (Fed. Cir. 2000); Munn, 970 F.2d at 871.  But upon declaring a fact witness to be lacking in credibility and rejecting the witness's testimony as unreliable, a special master cannot ignore other evidence in the record that is consistent with, but does not depend on, that witness's testimony.  To do so would be a violation of the Vaccine Act's mandate to consider the entire record.

Here, the special master rejected petitioner's written and oral testimony that Mr. Hodge was bitten by a tick and developed Lyme disease in 2003.  In doing so, he made a single, passing reference in a footnote to other evidence in the record that might support petitioner's testimony: He stated that "[a] medical record from 2009 also mentions possible tick exposure," but maintained that "this record does not contain any persuasive information about the time of the camping."  Hodge, 2022 WL 4954672, at *35 n.49 (citing Pet'r's Ex. 7 at 44).  He did not reference any other medical record.  Yet there are at least five separate medical records dated from August 2009—shortly after presence of antibodies for B. burgdorferi were detected in Mr. Hodge's blood—to January 2010 that implicitly associate the presence of those antibodies to the onset of Mr. Hodge's OCD around 2004, and more than one record that explicitly states that Mr. Hodge's Lyme disease predated his OCD symptoms.  Set forth below are the portions of these and other medical records that relate to the timing of Mr. Hodge's tick exposures, contraction of Lyme disease, and development of OCD:[13]

---

[12]  This quotation is from earlier in the special master's decision.  See Hodge, 2022 WL 4954672, at *34.

[13]  Many of the quoted notes are handwritten.  The court retains the original abbreviations, punctuation, and grammar, but makes one alteration for an obvious misspelling and omits irrelevant comments.

- August 4, 2009, Olive View-UCLA Medical Center ("Olive View") neurology department, resident physician's notes on Mr. Hodge's chief complaint and the history of his illness:

  > Pt was normal prior to age of 17, abrupt onset of OCD-like behavior (counting, checking, etc) over 1 month, then onset of a mental "fogginess"/"detachment from reality" of insidious onset that has since waxed and waned with periods of "normalcy." By the age 19, mother states he has never been back to baseline psych level—always somewhat detached/[weird]. At age 18 1/2 had routine hep B vaccine, then that night had stabbing spinal/back pain c̄ neg CT head, Age 19, pt c/o "arm/neck/back" muscle and skin "tightness" c̄ spasms of gradual onset (intermittent). . . . ⊕ tick exposure in NorCal c̄ neighbor c̄ Lyme Dx. Mother convinced sx's 2/2 Hep vaccine

  Pet'r's Ex. 7 at 46; see also id. at 45 (setting forth the resident physician's assessment: "22 y/o M c̄ . . . psychiatric d/o including OCD behavior, bipolar vs. schizoaffective d/o all of varying onsets starting at age 17.").

- August 4, 2009, Olive View neurology department, attending physician's assessment:

  > 22 yr old male c̄ hx of behavioral problem starting at age 17. Pt has hx of tick bite? Exposure to northern California Lyme? Pt had hx of fever neck sinus symptoms. Pt examined  He has normal gen physical & neurological exam. . . . Imp. → Hx of Lyme?

  Id. at 45.

- September 24, 2009, Olive View infectious disease outpatient clinic, physician's "subjective" notes:

  > 22 yo ♂ c̄ ? Lyme disease, had characteristic EM rash after went camping, on back of Ⓡ calf 3 yrs ago. Then 6 wks after rash, had "OCD" type symptoms. Was given amoxicillin for a squirrel bite, then 2 months amox for ? sinusitis. . . . Went camping a few times prior.

  Pet'r's Ex. 14 at 457.

- September 29, 2009, Olive View neurology department, a different resident physician's notes on Mr. Hodge's chief complaint and the history of his illness: "pt c̄ OCD sxs, 'bad mood swings', hx of hallucinations, pt c̄ hx of tick bite at Monterey County, CA, pt c̄ chronic HA, pt never Rx'ed for lyme

-14-

dx."  Pet'r's Ex. 7 at 44; <u>see also</u> <u>id.</u> at 43 (noting, in the resident physician's assessment and plan, that Mr. Hodge was "⊕ past lyme disease exposure"[14]).

- October 22, 2009, Olive View initial psychiatric evaluation, psychiatrist's assessment:  "22 y/o ♂ c̄ 4-5 yr hx of cognitive sx's assoc c̄ high exposure to Lyme disease."  Pet'r's Ex. 14 at 447.

- December 3, 2009, Olive View infectious disease outpatient clinic, physician's "subjective" notes:

> Pt was in his normal state of health until ~4 yrs ago, when family noted the onset of OCD and cognitive disturbances.  Pt reportedly had exposure to tick bites while camping in Big Sur.  Mother also states she recalls rash on L leg.  Over past few years, patient has been plagued by progressive fatigue, headaches, memory disturbances, myalgias which have left him unable to function.

Pet'r's Ex. 7 at 22.

- December 11, 2009, Olive View infectious disease outpatient clinic, physician's notes:  "24 yr old male with . . . chronic neuropsychiatric syndrome (depression; obsessive compulsive disorder; changes in cognition) and hx of possible Lyme disease 4-5 years PTA while living in Big Sur area (+ hx of tick bites; + hx of rash Rxed c̄ short course of antibiotics)."  Pet'r's Ex. 14 at 3.

- December 17, 2009, Olive View psychiatric/infectious disease outpatient clinic, psychiatrist's assessment:  "OCD-like sx's assoc c̄ anxiety – Possible Lyme c̄ neuro Ψ sx's - Can't exclude 1° cause."  Pet'r's Ex. 7 at 37; <u>see also</u> <u>id.</u> (indicating that Mr. Hodge was being "followed for possible neurolyme with neuropsychiatric sxs").

- December 22, 2009, Olive View, physician's notes on the history of Mr. Hodge's illness:  "22-yo man with a history of possible Lyme disease 4-5 years ago who subsequently developed new obsessive compulsive symptoms (concerns about contamination, incessant counting) and changes in cognition . . . ."  Pet'r's Ex. 14 at 5; <u>see also</u> <u>id.</u> at 9 (indicating, in a December 23, 2009 record made by a different physician, that Mr. Hodge was being followed for "neuropsychiatric disorders as complication of his lyme disease"), 12 (indicating, in another record dated December 23, 2009, from a third physician, that Mr. Hodge had a "hx of likely lyme disease 5 years ago, untreated then").

---

[14]  There appear to be two letters immediately following the word "exposure" (perhaps "VT") that are double underscored, but it is difficult to ascertain precisely what they are.

- December 31, 2009, Olive View infectious disease outpatient clinic, physician's "subjective" notes: "22 y/o ♂ being followed by ID for unexplained neurologic/cognitive deficits c̄ MRI evidence of demyelination in setting of possible tick bite." Pet'r's Ex. 7 at 21.

- January 11, 2010, private infectious disease specialist's notes on the history of Mr. Hodge's illness:

> [T]he patient and his mother recall that the patient had spent a great deal of time visiting in Monterey County near Salinas and also in the Big Sur area because his grandparents were there. At age 17, the patient and the rest of his family had camped out at Big Sur. The patient's mother recalls that there were ticks all over them, their dog, and their belongings at that time. Approximately 2 months after that trip, the patient developed severe muscle aches and fatigue. The patient also may have had some rashes, which his mother believes could have been of the bull's eye type. Six months after the camping trip, the patient suddenly developed OCD and in fact has not really been normal since that time, although it is noted he did have the major breakdown starting 2 years ago [around the time of his hepatitis B vaccination]. . . . The patient and his mother stated he was angry, agitated, and had hallucinations. The patient was followed at a mental health clinic, but no specific diagnosis other than the OCD was found . . . . Finally, a brain MRI was done and lesions were found. . . . In the meantime, the patient's mother had found out that other people in the area of Big Sur and also Monterey County, where the patient had been, had contracted Lyme disease, and she became concerned about this.

Pet'r's Ex. 13 at 5.

The special master does not mention four of the medical records excerpted above in his decision: the medical records dated September 29, 2009, and December 3, 2009, and the two medical records dated December 23, 2009. Additionally, for all but two of the remaining medical records excerpted above—those dated August 4, 2009, and December 17, 2009—the special master only describes portions of the records not quoted by the court. Given his decision to assess whether one medical record included persuasive evidence regarding the timing of Mr. Hodge's camping trip and possible tick exposures, it is unclear why the special master would not similarly assess the other medical records that referenced these key events.

The special master's failure to discuss these other medical records is problematic because they bear several hallmarks of reliability. First, the notes in these medical records regarding Mr. Hodge's tick exposures and OCD reflect information that was conveyed to the physicians closer in time to the relevant events, and at a time when it made sense to convey that information to the

physicians (in the wake of the detection of antibodies for B. burgdorferi in Mr. Hodge's blood).[15] Second, the notes reflect information that was conveyed to the physicians well before petitioner or Dr. Tornatore linked Mr. Hodge's Lyme disease and OCD to his alleged vaccine-caused injury.[16]  Thus, petitioner and Mr. Hodge were not motivated by this litigation when recounting Mr. Hodge's history of tick exposures and OCD, but instead by the need to provide the physicians with information relevant to the newly discovered presence of antibodies for B. burgdorferi in Mr. Hodge's blood.  And third, the medical history reflected in these notes is generally consistent, even though it is evident from the distinct manners in which the information was recorded that petitioner and Mr. Hodge were required to recount the relevant events numerous times to numerous physicians.  Overall, while it is true that many of the notes in these medical records regarding Mr. Hodge's tick exposures and OCD were likely derived from information provided by petitioner, there is every reason to believe that they portray a substantially accurate picture of Mr. Hodge's health in the years leading up to his hepatitis A and hepatitis B vaccinations.  Indeed, the special master did not find that the statements that petitioner likely made to these physicians in 2009 and early 2010 were not credible; his credibility determination was limited to petitioner's testimony, which she first offered by way of affidavit in October 2014.

At bottom, the special master's failure to consider these medical records when determining whether it was more likely than not that Mr. Hodge's tick exposures and Lyme disease predated his OCD symptoms violates the Vaccine Act's mandate to consider the record as a whole, and therefore his conclusion on this issue was not in accordance with law.  Further, because the special master did not consider all of the relevant evidence in the record, his fact findings regarding the timing of Mr. Hodge's exposure to ticks, contraction of Lyme disease, and development of OCD symptoms are arbitrary and capricious.  See Hines v. Sec'y of HHS, 940 F.2d 1518, 1528 (Fed. Cir. 1991) (observing that under the "highly deferential" arbitrary and capricious standard, reversible error is "extremely difficult to demonstrate" when "the special master has considered the relevant evidence of record" (emphasis added)).  Consequently,

---

[15]  Petitioner asserts that Mr. Hodge's tick exposures and rash predated his OCD symptoms, which he began to exhibit when he was sixteen years old (in the 2003-2004 time period).  Antibodies for B. burgdorferi were detected in Mr. Hodge's blood on June 5, 2009.  The excerpted medical records are dated from August 4, 2009, to January 11, 2010, and the first time petitioner testified regarding Mr. Hodge's tick exposures and OCD was in her October 1, 2014 affidavit.

[16]  In the original petition, filed on July 15, 2009, just forty days after antibodies for B. burgdorferi were detected in Mr. Hodge's blood, petitioner suggested only that the hepatitis A and hepatitis B vaccines caused a demyelinating disease; the theory of significant aggravation is not even suggested.  Further, petitioner's first affidavit, signed on January 13, 2011, and filed the following day, does not mention Lyme disease or OCD.  The first evidence that petitioner considered Mr. Hodge's alleged vaccine-caused injury to be related to his Lyme disease and OCD was Dr. Tornatore's August 23, 2013 expert report identifying the illness suffered by Mr. Hodge and the onset of the symptoms of that illness.  Petitioner did not provide testimony regarding Mr. Hodge's tick exposures and OCD until the submission of her second affidavit on October 1, 2014.

pursuant to 42 U.S.C. § 300aa-12(e)(2)(B), the court sets aside the special master's conclusion—
and the findings of fact underlying that conclusion—that petitioner did not satisfy her burden to
prove, by a preponderance of evidence, that Mr. Hodge contracted Lyme disease in 2003.[17]

### C.  Consideration of the Record as a Whole

The question of when Mr. Hodge contracted his Lyme disease is critical to petitioner's
case because her theory of causation, as espoused by Dr. Tornatore, is premised on Mr. Hodge's

---

[17]  Notably, the special master found petitioner to not be a credible witness because, "[a]t
times," her testimony was in conflict with the medical records, internally inconsistent, and
hyperbolic; he then provided several examples of these "flaws." Hodge, 2022 WL 4954672, at
*33-34.  In this decision, the court sets aside only one aspect of this determination—that
petitioner's testimony concerning the sequence of Mr. Hodge's tick exposures, contraction of
Lyme disease, and exhibition of OCD symptoms was not credible.  Nevertheless, a few
comments regarding some of the "flaws" identified by the special master are warranted.  First, it
seems unfair to rely on Dr. Nasse's statement that he treated Mr. Hodge sometime between 2000
and 2003 to criticize petitioner for her inconsistent statements regarding the treatment dates,
since Dr. Nasse's statement is itself contradicted by pharmacy records indicating that Dr. Nasse
prescribed Risperdal and Adderall for Mr. Hodge in September 2004.

Second, there are notes in a few medical records from 2007, unmentioned by the special
master, that provide some support for petitioner's claim that Mr. Hodge experienced significant
weight loss (albeit not to the magnitude petitioner describes in her affidavits).  See, e.g., Pet'r's
Ex. 65 at 5 (indicating, in a medical record dated June 20, 2007, that petitioner reported "weight
loss, difficulty eating" "over the last year"); Pet'r's Ex. 10 at 3 (indicating, in a medical record
dated November 16, 2007, that Mr. Hodge "lost significant weight, between 25-30 pounds in
recent months").

Third, unlike the special master, the court does not find it "difficult to reconcile"
petitioner's assertions in her third affidavit regarding Mr. Hodge switching between being afraid
to leave the house and refusing to go in the house, especially in light of her comment later in the
same affidavit that a medication helps Mr. Hodge sleep so that her "entire life isn't consumed
with chasing him down in the streets—that is, when he isn't afraid to wear clothes or leave the
house." Pet'r's Ex. 21 at 3.  Given the manifestation of his illness, as described in the medical
records, it seems quite likely that Mr. Hodge's behavior could shift from one extreme to the
other.

Fourth, the special master ascribes more precision to petitioner's references to particular
years and ages than is warranted by the record.  He recounts petitioner's oral testimony that the
pivotal camping trip occurred when Mr. Hodge was fourteen or fifteen years old, concludes that
it therefore would have occurred in 2001 or 2002, and then offers petitioner's written testimony
that the trip occurred in 2003 as a reason for discrediting her testimony.  However, Mr. Hodge
turned fourteen years old on May 15, 2001, and was fifteen years old from May 15, 2002, to May
14, 2003.  Accordingly, there is no actual conflict between petitioner's oral and written
testimony.

OCD being a manifestation of neuroborreliosis.  Given this fact, there are two paths available to the court:  (1) remand the case to the special master to consider the record as a whole and redetermine whether petitioner has satisfied her burden to establish that Mr. Hodge's tick exposures and Lyme disease predated his OCD symptoms,[18] 42 U.S.C. § 300aa-12(e)(2)(C); or (2) make its own findings of fact on this issue and, if necessary, remand the case for further proceedings, id. § 300aa-12(e)(2)(B).  To ensure that this 2009 case is not delayed any longer than necessary, the court opts to take the latter path.

To establish entitlement to compensation under the Vaccine Act, a petitioner alleging a vaccine-caused injury must prove causation by a preponderance of evidence.  Id. § 300aa-13(a)(1) (citing 42 U.S.C. § 300aa-11(c)(1)).

The burden of showing something by a "preponderance of the evidence," the most common standard in the civil law, "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'"

Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 622 (1993) (quoting In re Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (alterations in original)), quoted in Moberly v. Sec'y of HHS, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010).  When determining whether preponderant evidence exists to establish a fact, the court, like the special master, weighs the relevant evidence in light of the "entire record and the course of the injury, disability, illness, or condition . . . ."  42 U.S.C. § 300aa-13(b)(1); see also id. § 300aa-13(a)(1) (requiring fact findings to be based "on the record as a whole").

Further, the court must be mindful that there is "no basis for presuming that medical records are accurate and complete . . . as to all physical conditions" because "[a]lthough a patient has a 'strong motivation to be truthful' when speaking to his physician, that does not mean he will report every ailment he is experiencing, or that the physician will accurately record everything he observes."  Kirby v. Sec'y of HHS, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (citation omitted); accord id. ("[P]hysicians may enter information incorrectly and 'typically record only a fraction of all that occurs.'" (quoting Shapiro v. Sec'y of HHS, 101 Fed. Cl. 532, 538 (2011))); see also La Londe v. Sec'y of HHS, 110 Fed. Cl. 184, 203 (2013) (describing reasons why symptoms may not appear in a medical record, such as a petitioner's failure to recount an observed symptom, a physician's failure to record all information conveyed by a petitioner, and a petitioner's faulty recollection of events), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).  Additionally, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  Kirby, 997 F.3d at 1383 (quoting Shapiro, 101 Fed. Cl. at 538).

---

[18]   The special master has already found that Mr. Hodge had OCD prior to his 2006 hepatitis A and hepatitis B vaccinations.  Hodge, 2022 WL 4954672, at *34-35.

With these standards in mind, the court finds that when looking at the record as a whole, there is a preponderance of evidence that Mr. Hodge exhibited symptoms of OCD by September 28, 2004.  This evidence includes:

(1) records from the Los Angeles Unified School District reflecting that Mr. Hodge did not return to high school for the eleventh grade in the fall of 2004, when he was seventeen years old, Pet'r's Ex. 61 at 7;

(2) the September 27-28, 2004 pharmacy record indicating that Dr. Nasse prescribed Risperdal and Adderall for Mr. Hodge, who was seventeen years old at the time, Pet'r's Ex. 23;

(3) the March 21, 2005 medical record indicating that Mr. Hodge, who was seventeen years old at the time, had been taking Zoloft until two days prior, Pet'r's Ex. 3 at 4;

(4) the March 17, 2006 medical record indicating that Mr. Hodge's OCD started when he was seventeen years old (between May 15, 2004, and May 14, 2005), Pet'r's Ex. 5 at 2;

(5) the August 4, 2009 medical record indicating that Mr. Hodge experienced an "abrupt onset of OCD-like behavior" at age seventeen (between May 15, 2004, and May 14, 2005), Pet'r's Ex. 7 at 46; accord id. at 45;

(6) the October 22, 2009 medical record indicating that Mr. Hodge had a four-to-five year history of cognitive symptoms, which would place those symptoms in the 2004-2005 time period, Pet'r's Ex. 14 at 447; and

(7) the December 11, 2009 medical record indicating that Mr. Hodge had a "chronic neuropsychiatric syndrome (depression; obsessive compulsive disorder; changes in cognition)" four-to-five years prior, which would place that syndrome in the 2004-2005 time period, id. at 3.

Only two pre-2010 medical records suggest different dates for the onset of Mr. Hodge's OCD. See Pet'r's Ex. 7 at 22 (a December 3, 2009 medical record suggesting an onset date around 2005); Pet'r's Ex. 14 at 457 (a September 24, 2009 medical record suggesting an onset date around 2006).  Furthermore, petitioner consistently testified that Mr. Hodge's OCD symptoms manifested before September 28, 2004.  See Pet'r's Ex. 21 at 1 (indicating that Mr. Hodge's "OCD developed around age 16," in other words, between May 15, 2003, and May 14, 2004); Pet'r's Ex. 71 ¶ 10 (implying that Mr. Hodge had OCD during tenth grade, in other words, between the fall of 2003 and the spring of 2004); Hr'g Tr. 145 (testifying that Mr. Hodge showed symptoms of OCD at age sixteen—in other words, between May 15, 2003, and May 14, 2004— and was diagnosed with OCD at age 17).  At no time did petitioner testify that Mr. Hodge first exhibited OCD symptoms after September 28, 2004.

In addition, the court finds that when looking at the record as a whole, there is a preponderance of evidence that Mr. Hodge's tick exposures and resulting Lyme disease predated his OCD symptoms.  This evidence includes several medical records indicating that Mr. Hodge exhibited OCD symptoms after contracting Lyme disease:

> (1) the September 24, 2009 medical record indicating that Mr. Hodge developed a rash after camping, which was followed by OCD-like symptoms six weeks later, Pet'r's Ex. 14 at 457;

> (2) the December 22, 2009 medical record indicating that Mr. Hodge developed OCD symptoms after contracting "possible Lyme disease," id. at 5; and

> (3) the January 11, 2010 medical record indicating that Mr. Hodge camped at Big Sur, developed muscle aches and fatigue approximately two months later, and then developed OCD four months after that, Pet'r's Ex. 13 at 5.

The evidence also includes medical records that more generally associate Mr. Hodge's OCD with his tick exposures and/or Lyme disease:

> (1) the October 22, 2009 medical record indicating that Mr. Hodge had a four-to-five year history of cognitive symptoms that were associated with a "high exposure" to Lyme disease, Pet'r's Ex. 14 at 447;

> (2) the December 3, 2009 medical record indicating that Mr. Hodge's family noted an onset of OCD, that Mr. Hodge purportedly had an exposure to ticks while camping in Big Sur, and that petitioner recalled a rash on Mr. Hodge's left leg, Pet'r's Ex. 7 at 22; and

> (3) the December 11, 2009 medical record indicating that Mr. Hodge had a "chronic neuropsychiatric syndrome," along with "possible Lyme disease," a "history of tick bites," and a "history of rash" four-to-five years prior, Pet'r's Ex. 14 at 3.

There are no pre-2010 medical records indicating that Mr. Hodge's OCD symptoms predated his tick exposures or Lyme disease.  Furthermore, petitioner consistently testified that Mr. Hodge exhibited OCD symptoms after his tick exposures and subsequent bull's-eye rash.  See Pet'r's Ex. 19 at 1 (stating that "[w]ithin a year of" developing "a bulls-eye rash on his leg" at the conclusion of a camping trip, Mr. Hodge "began exhibiting OCD hoarder symptoms"); Pet'r's Ex. 71 ¶ 7 (stating that they moved on April 30, 2003, and indicating petitioner's belief that Mr. Hodge "had the tick bite that resulted in the bulls-eye rash on his leg" shortly before they moved, and began to exhibit OCD symptoms "some time after" they moved); Hr'g Tr. 145 (testifying that the tick exposure and "bull's-eye rash" predated Mr. Hodge's OCD symptoms).

In short, upon considering the record as a whole, including Mr. Hodge's medical and school records and petitioner's testimony, the court finds that (1) Mr. Hodge exhibited symptoms of OCD by September 28, 2004, and (2) Mr. Hodge's tick exposures and subsequent Lyme

disease predated his OCD symptoms. These findings negate the special master's determination that Dr. Tornatore's expert opinion was based on facts not established by petitioner and therefore could not be credited. They also negate the special master's determination that any further analysis of petitioner's theory of causation, including whether "a hepatitis B vaccine can aggravate Lyme disease," was unnecessary. Hodge, 2022 WL 4954672, at *37. Consequently, petitioner's entitlement to compensation must be resolved anew. And while the court is authorized to make the necessary fact findings and legal conclusions, 42 U.S.C. § 300aa-12(e)(2)(B), the special master, given his familiarity with the experts' opinions and the medical and scientific evidence supporting those opinions, is better positioned to assess petitioner's theory of causation in the first instance. See Munn, 970 F.2d at 870 ("[T]he key decision maker in the first instance is the special master."); Sword v. United States,[19] 44 Fed. Cl. 183, 188-89 (1999) ("[E]ven more than ordinary fact-finders, this Court has recognized the unique ability of Special Masters to adjudge cases in the light of their own acquired specialized knowledge and expertise. . . . A fact-finder, especially one with specialized experience such as a Special Master, can accept or reject opinion testimony, in whole or in part. . . . [T]he Special Master evaluates the testimony in light of the entire record, based on reasonable inferences born of common experience or the product of special expertise." (citations omitted)). Thus, the court will remand the case to the special master with instructions to reevaluate petitioner's entitlement to compensation in accordance with 42 U.S.C. § 300aa-13.

### III. CONCLUSION

Under the Vaccine Act, special masters are required to consider all of the evidence in the record, and when a special master violates this mandate, the reviewing court must set aside the findings of fact and conclusions of law affected by that violation and may then issue its own fact findings and legal conclusions. Here, the special master disregarded substantial, reliable evidence in the record that supported petitioner's later testimony regarding the sequence of events: that prior to his hepatitis A and hepatitis B vaccinations, Mr. Hodge was exposed to ticks, then developed a rash indicative of Lyme disease, and then exhibited symptoms of OCD. Consequently, the court sets aside the special master's conclusion—and the findings of fact underlying that conclusion—that petitioner did not satisfy her burden to prove, by a preponderance of evidence, that Mr. Hodge contracted Lyme disease in 2003. Additionally, to avoid further delay in this matter, the court issues its own fact findings regarding the sequence of events, concluding that petitioner has established, by a preponderance of evidence, that Mr. Hodge exhibited symptoms of OCD by September 28, 2004, and that his tick exposures and subsequent Lyme disease predated his OCD symptoms.

Finally, the court remands the case to the special master to reevaluate petitioner's entitlement to compensation in light of the court's fact findings. On remand, the special master shall not require the submission of any additional evidence or legal argument unless this prohibition would result in erroneous findings of fact or conclusions of law. Indeed, the record already appears to be complete since it includes all of Mr. Hodge's existing, relevant medical

---

[19] Although the respondent in all Vaccine Act cases is the Secretary of the Department of Health and Human Services, 42 U.S.C. § 300aa-12(b)(1), the respondent in Sword is identified as the United States.

and school records; petitioner's oral and written testimony; expert reports and testimony addressing petitioner's theory of causation; and legal memoranda and oral argument addressing petitioner's entitlement to compensation.  Ultimately, the decision regarding how to resolve entitlement is within the province of the special master, but given the extent of the information presently in the record, the special master may likely only need to issue a new decision on entitlement.

In sum, the court **GRANTS** petitioner's motion for review; **SETS ASIDE** the special master's conclusion that petitioner did not establish that Mr. Hodge contracted Lyme disease in 2003 and the findings of fact made in support of that conclusion; **FINDS** that Mr. Hodge exhibited symptoms of OCD by September 28, 2004, and that the tick exposures and Lyme disease predated Mr. Hodge's OCD symptoms; and **REMANDS** the case, for a period not to exceed ninety days, to the special master to reevaluate petitioner's entitlement to compensation.

**IT IS SO ORDERED.**

<u>s/ Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Senior Judge